FILED
IN CLERK'S OFFICE
US DISTRICT COURT E D N Y

★    JUL 08 2015    ★

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
FC ONLINE MARKETING, INC.,

Plaintiff,

-against-

BURKE'S MARTIAL ARTS, LLC and
JOHN JACOB BURKE,

Defendants.
-----------------------------------------------------------X
FEUERSTEIN, J.

**OPINION & ORDER**
**14-CV-3685 (SJF)(SIL)**

I.    Introduction

On June 11, 2014, plaintiff FC Online Marketing, Inc. ("plaintiff") commenced this

action against Burke's Martial Arts, LLC ("BMA") and John Jacob Burke ("Burke")

(collectively, "defendants"), asserting claims for copyright infringement under the Copyright Act

of 1976 ("the Copyright Act"), 17 U.S.C. §§ 101, *et seq.*; trademark infringement under the

Lanham Act, 15 U.S.C. §§ 1114, 1125, *et seq.*; cybersquatting under the Lanham Act, 15 U.S.C.

§ 1125(d); and unfair competition under the Lanham Act, 15 U.S.C. § 1125(a). On November

13, 2014, plaintiff filed an amended complaint, *inter alia*, adding claims for trade dress

infringement under the Lanham Act, 15 U.S.C. §§ 1114, 1125, *et seq.* Pending before the Court

are: (1) defendants' motion to dismiss the amended complaint in its entirety as against Burke,

and to dismiss plaintiff's copyright and trade dress infringement claims against BMA, pursuant

to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief; and

(2) plaintiff's motion pursuant to 17 U.S.C. § 502, 15 U.S.C. § 116 and Rule 65 of the Federal

Rules of Civil Procedure for a preliminary injunction enjoining defendants "from the sale of

1

services and goods that infringe [plaintiff's] copyrighted website content, [plaintiff's]

trademarked ILoveKickboxing.com mark ("the Mark"), and [plaintiff's] ILoveKickboxing

franchisee's trade dress[;] * * * [from] any unauthorized use of the aforesaid website content or

Mark[;] and from cybersquatting via the use of the infringing domain name

'ILove2Kickbox.com.'" For the reasons set forth below, defendants' motion is granted in part

and denied in part and plaintiff's motion is denied.


II.     Background

    A.     Factual Background

        1.     Allegations in Amended Complaint

Plaintiff "is a corporation that provides website design, search engine optimization, lead

generation and other online marketing services and products to its weight loss through fitness

licensees and franchisees." (Amended Complaint ["Am. Compl."], ¶ 3).

BMA is a limited liability corporation that provides kickboxing classes in the State of

Rhode Island. (Am. Compl., ¶ 4). Burke is the "Managing Member" of BMA. (Id., ¶ 5).

Plaintiff "owns a website entitled I Love Kickboxing Carle Place, located on the internet

at www.ilovekickboxingcarleplace.com (hereinafter referred to as 'Website')." (Am. Compl., ¶

10). According to plaintiff, "[t]he Website contains 'protectable elements' afforded copyright

protection, * * * includ[ing], but not limited to, the unique written content, images, graphics, and

* * * expressions set forth in the Website." (Id., ¶ 12). Plaintiff received a Certificate of

Registration from the United States Copyright Office indicating, *inter alia*, that registration had

been made for the Website, effective October 20, 2012. (Id., ¶ 13, Exhibit ["Ex."] A). Plaintiff

alleges that defendants infringed upon its copyright "by adapting [its] Website content ('the Work') and releasing said adaptation ('Infringing Content') on its company website, located on the Internet at the Infringing Domain Name[,]" (id., ¶ 15), www.ilove2kickbox.com, (id., ¶ 2).

Plaintiff also owns the trademark ILoveKickboxing.com ("the Mark"). (Am. Compl., ¶ 19). Plaintiff's CEO, Michael Parella ("Parella"), is "the driving forc[e] behind the Mark[] [and] is a top gun fitness consultant and thought leader." (Id.) According to plaintiff, "Parella's notoriety [sic] stems in part from running [plaintiff's] iLoveKickboxing.com fitness franchise ('ILKB')[,]" (id.), which "has generated over 100,000 enrollments for schools around the world in its first two years of operation." (Id.) On or about April 23, 2013, the Mark, consisting "of a winged heart with boxing gloves hanging on it behind the text 'iLoveKickboxing.com[,]'" (id., Ex. F), was registered with the United States Patent and Trademark Office ("USPTO"). (Id., ¶ 20, Ex. F). According to plaintiff, it "has used the Mark in commerce on, and in connection with, the sale of its services on hundreds of websites ('the Works' or 'Works') that bear the Mark." (Id., ¶ 21, Ex. G). Plaintiff alleges that defendants infringed upon its Mark "by registering a domain name ('ILove2Kickbox.com') strikingly and confusingly similar to [its] * * * Mark and adopting a confusingly similar trademark, releasing said adaptation ('Infringing Mark') on its company website, located at ILove2Kickbox.com." (Id., ¶ 23, Ex. H).

According to plaintiff, it "became aware of Defendants' use of the Infringing Content [and the Infringing Mark] on or about June 2, 2014." (Am. Compl., ¶¶ 16, 24). On that same date, plaintiff: (1) sent "a first notification of copyright infringement" to defendants, (id., ¶ 17, Ex. C); and (2) sent a "takedown notification" pursuant to the Digital Millennium Copyright Act, ("DMCA"), 17 U.S.C. §§ 512(c)(3) and (d)(3), to defendants' "Internet hosting provider

('GoDaddy')." (Id., ¶ 17, Ex. D). The next day, i.e., June 3, 2014, GoDaddy "'suspended' Defendants' website located on the Internet at ILove2Kickbox.com[,]" (Id., ¶ 18, Ex. E), and plaintiff notified defendants that they had infringed upon its Mark. (Id., ¶ 25, Ex. I). According to plaintiff, defendants knew of its Mark "prior to registering the Infringing Mark on GoDaddy because [they] were former * * * licensees [of plaintiff][,]" (id., ¶ 29), and "used the Infringing Mark to divert Internet traffic, and therefore revenue, from users searching for [plaintiff's] well-known fitness Mark, to the Infringing Domain name [ILove2Kickbox.com]." (Id., ¶ 31). Plaintiff alleges, *inter alia*, (1) that defendants' "unauthorized registration of the Infringing Domain Name creates a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the Infringing Domain Name, and is likely to falsely suggest a sponsorship, connection, license, or association of Defendant [sic], and the Infringing Domain Name, with [plaintiff][,]" (id., ¶ 33); and (2) that defendants' conduct "constitutes unfair competition * * * by, *inter alia*, directing search engine results toward an unauthorized and Infringing Domain Name and away from [plaintiff's] [W]ebsite and Works, which bear [plaintiff's] distinctive Mark." (Id., ¶ 35).

Plaintiff further alleges that it "has invested substantial time and financial resources in the creation of its extensive ILKB web presence ('Web Presence')[,]" (Am. Compl., ¶ 36, Ex. M), which "focused on a particular 'look and file [sic]' (ILKB 'Trade Dress') that would convert leads into sales." (Id., ¶ 36). According to plaintiff, BMA "in its www.atomickickboxing.com website, copied the 'look and feel' of [its] distinctive elements (24) as well as their corresponding arrangement" ("the Website Trade Dress claim"). (Id., ¶ 37, Ex. N).

In addition, plaintiff alleges that it has "invested substantial time and financial resources

in the creation of its trade dress for its 'brick and mortar' ILKB stores ('Store Trade Dress')."

(Am. Compl., ¶ 41, Ex. O).  According to plaintiff, plaintiff's and defendants' stores "are

remarkably similar, if not identical.  In particular, the brick wall, the red bench, the front desk,

the placement of merchandise, the workout area flooring, the use of the respective logos on the

wall (and the logo themselves) are all either identical or substantially similar" ("the Store Trade

Dress Claim").  (Id., ¶ 42, Ex. O).


     B.    Procedural History

     On June 11, 2014, plaintiff commenced this action against defendants, asserting claims

seeking damages and injunctive relief for copyright and trademark infringement, cybersquatting

and unfair competition.  On November 13, 2014, plaintiff filed an amended complaint, *inter alia*,

asserting claims against defendants seeking damages, injunctive relief, attorney's fees and costs

against defendants for copyright infringement (first claim for relief); trademark infringement

(second claim for relief); cybersquatting (third claim for relief); unfair competition (fourth claim

for relief); and trade dress infringement (fifth claim for relief).

     Defendants now move to dismiss the amended complaint in its entirety as against Burke,

and to dismiss plaintiff's copyright and trade dress infringement claims against BMA, pursuant

to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief.[1]

---

     [1] During a pretrial conference held before me on February 25, 2014, I, *inter alia*, (1)
granted (a) plaintiff's request to inspect and photograph defendants' store, and (b) defendants'
request to designate, inspect and photograph up to three (3) of plaintiff's franchises; and (2)
denied defendants' initial motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of
Civil Procedure with leave to renew so as to afford both parties an opportunity to submit
supplemental materials pertaining to plaintiff's Store Trade Dress claim on or before April 8,
2015.  Defendants renewed their motion, including the supplemental materials provided by both

Plaintiff moves pursuant to 17 U.S.C. § 502, 15 U.S.C. § 116 and Rule 65 of the Federal Rules of Civil Procedure for a preliminary injunction enjoining defendants "from the sale of services and goods that infringe [plaintiff's] copyrighted website content, [plaintiff's] trademarked ILoveKickboxing.com mark ("the Mark"), and [plaintiff's] ILoveKickboxing franchisee's trade dress[;] * * * [from] any unauthorized use of the aforesaid website content or Mark[;] and from cybersquatting via the use of the infringing domain name 'ILove2Kickbox.com.'"

III.    Discussion

    A.    Defendants' Motion to Dismiss

        1.    Standard of Review

The standard of review on a motion made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is that a plaintiff plead sufficient facts "to state a claim for relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." Id.

"A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Iqbal, 556 U.S. at 678, 129 S. Ct. 1937 (quoting Twombly, 550 U.S. at 555, 127 S. Ct. 1955). "Nor does a complaint suffice if it tenders 'naked

_____

sides, on April 8, 2015.

assertion[s]' devoid of 'further factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 557, 127 S. Ct. 1955). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. 544, 127 S. Ct. at 1959.

In deciding a motion pursuant to Rule 12(b)(6), the Court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. See Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P., 737 F.3d 166, 176 (2d Cir. 2013) (quotations and citation omitted); Grullon v. City of New Haven, 720 F.3d 133, 139 (2d Cir. 2013). However, this tenet "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678, 129 S. Ct. 1937. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id. at 679, 129 S. Ct. 1937. "In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id.; see also Ruston v. Town Bd. for Town of Skaneateles, 610 F.3d 55, 59 (2d Cir. 2010).

Nonetheless, a plaintiff is not required to plead "specific evidence or extra facts beyond what is needed to make the claim plausible." Arista Records, LLC v. Doe 3, 604 F.3d 110, 120-1 (2d Cir. 2010); accord Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 729-30 (2d Cir. 2013). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679, 129 S. Ct. 1937.

7

In deciding a motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must limit itself to the facts alleged in the complaint, which are accepted as true; to any documents attached to the complaint as exhibits or incorporated by reference therein; to matters of which judicial notice may be taken; or to documents upon the terms and effect of which the complaint "relies heavily" and which are, thus, rendered "integral" to the complaint. Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002); see also ASARCO LLC v. Goodwin, 756 F.3d 191, 198 (2d Cir. 2014), cert. denied, 135 S. Ct. 715, 190 L. Ed. 2d 441 (2014).

      2.      Claims against Burke

Defendants contend, *inter alia*, that the amended complaint should be dismissed in its entirety as against Burke because there are no allegations against him specifically and no allegations that suggest a potential claim against him." (Defendants' Memorandum of Law ["Def. Mem."] at 5).

"[A]lthough the Copyright Act does not expressly render anyone liable for infringement committed by another, * * * one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." Arista Records, 604 F. 3d at 117-18 (quotations, brackets, emphasis and citations omitted); accord Matthew Bender & Co., Inc. v. West Publ'g Co., 158 F.3d 693, 706 (2d Cir. 1998). "The knowledge standard is an objective one; contributory infringement liability is imposed on persons who know or have reason to know of the direct infringement[.]" Arista Records, 604 F.3d at 118 (quotations, emphasis and citations omitted). "Two types of activities that lead to contributory liability are: (i) personal conduct that encourages or assists the

8

infringement; and (ii) provision of machinery or goods that facilitate the infringement." Matthew Bender, 158 F.3d at 706; see also Arista Records, 604 F.3d at 118 (holding that contributory liability "exists if the defendant engages in personal conduct that encourages or assists the infringement[.]"(quotations and citations omitted)). "The resolution of the issue depends upon a determination of the function that the alleged infringer plays in the total reproduction process." Arista Records, 604 F.3d at 118 (quotations, alterations and citations omitted). Thus, "[c]orporate officers can be held vicariously liable for copyright infringement if they had (i) the right and ability to supervise the infringing activity; and (ii) an obvious and direct financial interest in exploitation of copyrighted materials." Carell v. Shubert Org., Inc., 104 F. Supp. 2d 236, 270 (S.D.N.Y. 2000); accord Capitol Records, Inc. v. Wings Digital Corp., 218 F. Supp. 2d 280, 285 (E.D.N.Y. 2002). "Where a complaint lacks any description of acts that could lead to the conclusion of direct copyright infringement, or allegations of authorization or participation that would indicate vicarious liability or contributory infringement, claims sounding in those theories must be dismissed." Warren v. John Wiley & Sons, Inc., 952 F. Supp. 2d 610, 619 (S.D.N.Y. 2013) (quotations, brackets and citation omitted).

Similarly, "[a] company's individual officer can be held personally liable under the Lanham Act if the officer is a moving, active conscious force behind the corporation's infringement." Century 21 Real Estate, LLC v. Bercosa Corp., 666 F. Supp. 2d 274, 283 (E.D.N.Y. 2009) (quotations and citation omitted); see also KatiRoll Co. v. Kati Junction, Inc., 33 F. Supp. 3d 359, 370 (S.D.N.Y. 2014) (""[F]or an individual to be held personally liable for a corporation's acts of infringement [under the Lanham Act], he or she must be the moving, active, conscious force behind the infringement." (quotations, brackets and citation omitted)); Bambu

9

Sales, Inc. v. Sultana Crackers, Inc., 683 F. Supp. 899, 913 (E.D.N.Y. 1988) ("[P]ersonal liability for trademark infringement and unfair competition is established if the officer is a moving, active conscious force behind the defendant corporation's infringement." (quotations, brackets and citation omitted)). "In determining whether the officer's acts render him individually liable, it is immaterial whether he knows that his acts will result in an infringement." Bambu Sales, 683 F. Supp. at 913-14. (quotations, alterations and citation omitted); accord Carell, 104 F. Supp. 2d at 271. "Contributory infringement holds liable '[o]ne who, with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another. . . .'" Carell, 104 F. Supp. 2d at 271 (quoting Demetriades v. Kaufmann, 690 F. Supp. 289, 292–93 (S.D.N.Y.1988)).

Plaintiff's allegations, *inter alia*, that Burke is the managing member of BMA; was a former licensee of plaintiff and, thus, knew of plaintiff's Website, Mark and trade dress; "used the Infringing Mark to divert Internet traffic, and therefore revenue, from users searching for [plaintiff's] * * * Mark," (Am. Compl., ¶ 31); and, together with BMA, used plaintiff's "Work for their own economic gain," (id., ¶ 51; see also id., ¶ 52 ("Upon information and belief, Defendants' acts of copyright infringement were * * * intended for its [sic] own economic gain")), are sufficient at the pleadings stage to state plausible claims against Burke for copyright, trademark and trade dress infringement; unfair competition; and cybersquatting. See, e.g. KatiRoll, 33 F. Supp. 3d at 370 (denying the defendants' motion to dismiss trade dress infringement and unfair competition claims against the individual defendants where the complaint alleged, *inter alia*, that one of the defendants directed the activities of the defendant corporation and that all of the defendants had worked at the plaintiff corporation); Capitol

Records, 218 F. Supp. 2d at 285 (finding that the complaint stated a plausible claim for copyright infringement against the individual defendant insofar as it alleged, *inter alia*, that he was the president and sole shareholder of the corporate defendant and managed and financially benefitted from the production and sale of the acts of copyright infringements). Accordingly, the branch of defendants' motion seeking dismissal of the amended complaint in its entirety against Burke is denied.

### 3. Trade Dress Infringement Claims

"A product's trade dress encompasses the overall design and appearance that make the product identifiable to consumers." Nora Beverages, Inc. v. Perrier Grp. of Am., Inc. ("Nora Beverages II"), 269 F.3d 114, 118 (2d Cir. 2001). "Trade dress originally included only the packaging, or 'dressing,' of a product, but it has been expanded to encompass * * * the design or configuration of the product itself." Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 114 (2d Cir. 2001) (quotations and citations omitted); see also L. & J.G. Stickley, Inc. v. Canal Dover Furniture Co., Inc., 79 F.3d 258, 262 (2d Cir. 1996) ("Although trade dress once referred only to the manner in which a product was 'dressed up' to go to market with a label, package, display card, and similar packaging elements, the concept now includes the design and appearance of the product as well as that of the container. * * * It is essentially the total image and overall appearance of a product." (quotations, brackets and citations omitted)). The purpose of trade dress law is "to protect an owner of a dress in informing the public of the source of its products, without permitting the owner to exclude competition from functionally similar products." Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc., 58 F.3d 27, 33 (2d Cir. 1995); see also Nora

11

Beverages II, 269 F.3d at 119 ("When evaluating [trade dress] claims, courts must not lose sight of the underlying purpose of the Lanham Act, which is protecting consumers and manufacturers from deceptive representations of affiliation and origin." (quotations and citation omitted)). "Trade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products. In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying." TrafFix Devices, Inc. v. Mktg. Displays, Inc., 532 U.S. 23, 121 S.Ct. 1255, 1260, 149 L.Ed.2d 164 (2001)); see also Best Cellars, Inc. v. Wine Made Simple, Inc., 320 F. Supp. 2d 60, 69 (S.D.N.Y. 2003) ("The text of the statute makes clear that the Lanham Act is not intended to enable monopolistic use of a commercial idea, but rather aims to guard against confusion in the marketplace that would harm both buyers and sellers.")

In order to establish any trade dress infringement claim under the Lanham Act, "the plaintiff must prove (1) that the mark is distinctive as to the source of the good, [] (2) that there is a likelihood of confusion between its good and the defendant's [product][,]" Yurman Design, 262 F.3d at 115; accord Forschner Grp., Inc. v. Arrow Trading Co., Inc., 124 F.3d 402, 407 (2d Cir. 1997), and (3) that the "unregistered trade dress is 'not functional.'" Yurman Design, 262 F.3d at 116; see also TrafFix Devices, 532 U.S. at 29, 121 S. Ct. 1255 ("[T]rade dress protection may not be claimed for product features that are functional."); Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 769, 112 S. Ct. 2753, 120 L. Ed. 2d 615 (1992) ("[E]ligibility for protection under § 43(a) [of the Lanham Act] depends on nonfunctionality.")

a.    Distinctiveness

For trade dress claims based upon product packaging, "the plaintiff may prove distinctiveness by showing *either* that the 'intrinsic nature' of the mark serves to identify a particular source (what is known as 'inherent distinctiveness') *or* that 'in the minds of the public, the primary significance of [the mark] is to identify the source of the product rather than the product itself' (what is known as 'acquired distinctiveness' or 'secondary meaning')." Yurman Design, 262 F.3d at 115 (brackets and emphasis in original) (quoting Wal-Mart Stores v. Samara Bros., Inc., 529 U.S. 205, 210-11, 120 S. Ct. 1339, 146 L. Ed. 2d 182 (2000)). "The product design plaintiff, however, must always make the second, more difficult showing." Yurman Design, 262 F.3d at 115.

"Under the rubric of inherent distinctiveness, the focus of the inquiry is whether or not the trade dress of a product serves primarily as an indication of origin, such that consumers will readily rely on it to distinguish the product from those of competing manufacturers." Forschner Grp., 124 F.3d at 407-08; see also L. & J.G. Stickley, 79 F.3d at 262 ("An inherently distinctive trade dress is one that is likely to serve primarily as a designator of origin of the product, * * * taking into account the nature of the designation and the context in which it is used." (quotations and citations omitted)). "As an element of trade dress, however, * * * color is never inherently distinctive, but is capable of identifying a product's source and may be a protected trademark only when it has attained secondary meaning and has come to be associated in the consuming public's mind with a single source of origin." Forschner Grp., 124 F.3d at 408; see also Wal-Mart, 529 U.S. at 212, 120 S. Ct. 1339 ("[Product] design, *like color*, is not inherently distinctive." (emphasis added)). "Association of origin reflects the goodwill a manufacturer has

13

built up in its product such that prospective consumers associate this product feature with the producer rather than with the product itself." Forschner Grp., 124 F.3d at 408.

"Secondary meaning refers to a subsequent significance added to the original meaning of the trade dress due to a producer's use of it." L. & J.G. Stickley, 79 F.3d at 263 (quotations and citation omitted). In order to demonstrate that its trade dress has attained secondary meaning, the plaintiff must "show that, over time, the trade dress has become identified with its producer in the minds of potential consumers." Id.; see also Forschner Grp., 124 F.3d at 408 ("In a case involving secondary meaning, the crucial question is whether the public is moved in any degree to buy an article because of its source." (quotations and citation omitted)). In determining whether the plaintiff's trade dress has acquired secondary meaning, courts consider the following factors: "(1) advertising expenditures, (2) consumer studies linking the dress to the source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the dress, and (6) length and exclusivity of the [dress]'s use." L. & J.G. Stickley, 79 F.3d at 263 (quotations and citation omitted). However, "no single factor is determinative, and every element need not be proved[.]" Id. (quotations, brackets and citation omitted).

"[E]ven a showing of secondary meaning is insufficient to protect product designs that are overbroad or 'generic'– those that refer to the genus of which the particular product is a species' [sic]." Yurman Design, 262 F.3d at 115 (quotations, brackets and citation omitted). Trade dress law does not "protect an idea, a concept, or a generalized type of appearance." Id. at 115-116 (quotations and citation omitted). Since "[p]roduct design is driven primarily by the usefulness or aesthetic appeal of the object[,] trade dress protection for product design [] entails a greater risk of impinging on ideas as compared with protection of packaging or labeling." Id. at

14

116. Accordingly, courts must exercise "particular caution, when extending protection to product designs." Id. at 114 (quotations and citation omitted).

Courts "judge the distinctiveness of packaging trade dress * * * on a spectrum of increasing distinctiveness as generic, descriptive, suggestive, or arbitrary/fanciful." Nora Beverages, Inc. v. Perrier Grp. of Am., Inc. ("Nora Beverages I"), 164 F.3d 736, 743 (2d Cir. 1998) (quotations and citation omitted). "Generic words or phrases may never serve as trademarks; descriptive marks, while not inherently distinctive, may be trademarks upon a showing of secondary meaning; and suggestive, arbitrary and fanciful terms are inherently distinctive trademarks even without a showing of secondary meaning." Landscape Forms, Inc. v. Columbia Cascade Co., 113 F.3d 373, 377 (2d Cir. 1997); see also Nora Beverages I, 164 F.3d at 743 ("Suggestive, arbitrary, or fanciful trade dress is considered inherently distinctive and thus protectable unless it is also functional. * * * Descriptive trade dress merits protection only if it has acquired secondary meaning in the marketplace. * * * Generic trade dress consisting of the shape of a product that conforms to a well-established industry custom is not protectable." (quotations, brackets and citation omitted)).

Any trade dress claim under the Lanham Act "will always require a look at the product and the market in which it competes," Landscape Forms, 113 F.3d at 378, and must be "construed in the light of a strong federal policy in favor of vigorously competitive markets[.]" Id.; accord Nora Beverages II, 269 F.3d at 119.


i.      Website Trade Dress Claim

Plaintiff alleges, *inter alia*, (1) that it "has invested substantial time and financial

15

resources in the creation of its extensive ILKB web presence ('Web Presence')[,]" (Am. Compl.,

¶ 36; see also id., ¶ 38); (2) that it "currently has active hundreds of ILKB websites including one

of their flagship websites located on the Internet at www.ilovekickboxingcarleplace.com[,]" (id.,

¶ 36 and Ex. M); (3) that its "ILKB Web Presence was designed and refined after expending

thousands of man hours, and significant amounts of money, focused on a particular 'look and file

[sic]' (ILKB 'Trade Dress') that would convert leads into sales[,]" (id., ¶ 36); and (4) that BMA

"copied the 'look and feel' of [its] distinctive elements (24) as well as their corresponding

arrangement" in its www.atomickickboxing.com website. (Id., ¶ 37 and Ex. N). Plaintiff

identifies "example[s]" of BMA's "literal copying" of its twenty-four (24) "distinctive elements"

in the amended complaint, such as: (a) the "use of a radiant element" above the main content of

the website, (id., ¶¶ 37(a) and 37(o)); (b) the placement of the "logo and action figure elements,"

(id., ¶¶ 37(b) and (p)); (c) the "use of [a] solid blue border," (id., ¶¶ 37(c) and (q)); (d) the

similarity between BMA's phrase, "Celebrity Cranston Kickboxing Instructor Will Show" and

plaintiff's phrase, "Famous Carle Place Kickboxing Instructor Shows," (id., ¶ 37(d)); (e) the

"placement of the first 'contact box element,'" (id., ¶ 37(e)); (f) the use of the same text, "Enter

your Name and Primary Email to get," in the first line in the contact box, (id., ¶ 37(f)); (g) the

inclusion of a "Get Instant Access" button, with "the same text and call to action," in the contact

box, (id., ¶¶ 37(g) and (x)); etc. According to plaintiff, "[t]he distinct and non-functional

elements of [its] Trade Dress include, but are not limited to, the elements enumerated [in the

amended complaint]." (Id. at 40).

   Although "the application of trade dress law to websites is a somewhat 'novel' concept,"

Parker Waichman LLC v. Gilman Law LLP, No. 12-cv-4784, 2013 WL 3863928, * 4 (E.D.N.Y.

16

July 24, 2013); <u>see also Lepton Labs, LLC v. Walker</u>, 55 F. Supp. 3d 1230, 1239 (C.D. Cal. 2014) ("Whether a website's design can constitute protectable trade dress under the Lanham Act is a fairly unsettled issue"), the district courts that have considered the issue have almost universally "recognized that a website's 'look and feel' can constitute a protectable trade dress[.]" <u>Parker Waichman</u>, 2013 WL 3863928, * 4 (citing cases); <u>accord Ingrid & Isabel, LLC v. Baby Be Mine, LLC</u>, No. 13-cv-01806, 2014 WL 5507669, at * 26 (N.D. Cal. Oct. 1, 2014); <u>Lepton Labs</u>, 55 F. Supp. 3d at 1239; <u>Conference Archives, Inc. v. Sound Images, Inc.</u>, Civ. No. 3:2006-76, 2010 WL 1626072, at * 16 (W.D. Pa. Mar. 31, 2010). "Given the conceptual similarity between 'look and feel' and 'design,' <u>Wal-Mart</u> suggests that Plaintiff must show that its website's 'look and feel' is distinctive through its secondary meaning[.]" <u>Ingrid & Isabel</u>, 2014 WL 5507669, at * 26.

"[A] mere cataloguing of a website's features does not give defendants adequate notice of a plaintiff's trade dress claim, * * * especially, when[] * * * the list of features comprising the trade dress is not complete[.]" <u>Parker Waichman</u>, 2013 WL 3863928, at * 4 (quotations and citations omitted). "Rather, * * * a complaint must 'synthesize' how th[o]se features combine to create the website's protectable 'look and feel.'" <u>Id.</u> (quotations and citation omitted).

A complaint that lists only some, but not all, of the features of the plaintiff's website that the plaintiff believes constitute its trade dress is insufficient to state a plausible claim for trade dress infringement under the Lanham Act. <u>See</u>, <u>e.g. Parker Waichman</u>, 2013 WL 3863928, at * 4; <u>Ingrid & Isabel</u>, 2014 WL 5507669, at * 26 ("Plaintiff employs language suggesting that the[] [enumerated] components are only some among many, which weighs against Plaintiff's claims, and Plaintiff lists only alleged similarities, not a definitive list of the elements constituting [its]

17

website's 'look and feel.'" (quotations and citation omitted)); Lepton Labs, 55 F.Supp. 3d at 1239 ("Neither can a plaintiff only list some elements of a website's design among many and claim that those features establish the site's look and feel.") Moreover, conclusory allegations that the trade dress "serves to identify [the plaintiff]," is "widely recognized," is "distinctive," and is "not merely functional;" and that the defendant's similar website is "likely to cause consumer confusion," see, e.g. (Am. Compl., ¶¶ 38-40), are not entitled to the assumption of truth and are insufficient to state a plausible claim for trade dress infringement under the Lanham Act. See, e.g. Vedder Software Grp. Ltd. v. Insurance Servs. Office, Inc., 545 F. App'x 30, 33 (2d Cir. Oct. 18, 2013); Boarding Sch. Review, LLC v. Delta Career Educ. Corp., No. 11 Civ. 8921, 2013 WL 6670584, at * 7 (S.D.N.Y. Mar. 29, 2013); Parker Waichman, 2013 WL 3863928, at * 4.

Furthermore, plaintiff's conclusory allegation that the "look and feel" of its "Web Presence" "serves to identify [it] as the sources of its services," (Am. Compl., ¶ 38), is belied by the fact that it "currently has active hundreds of ILKB websites[,]" (id., ¶ 36), not all of which contain the purportedly "distinctive elements" enumerated in the amended complaint as constituting its trade dress. Compare http://www.ilovekickboxing.com; http://www.ilovekickboxing-stpaulmn.com; http://www.ilovekickboxing-georgia.com with http://www.ilovekickboxingnewyorkny.com; http://www.ilovekickboxingbayport.com; http://www.ilovekickboxingmedford.com. See Parker Waichman, 2013 WL 3863928, at * 4 n. 3 ("The Court seriously questions whether th[e] [pleading] defect is curable, as Plaintiff's allegation that the 'look and feel' of [its website] 'serves to identify [Plaintiff] as the source of its services' * * * is belied by the fact that Plaintiff has 'hundreds of websites' * * * that do not

18

contain the features * * * described in the Complaint as constituting protectable trade dress."

(citations omitted)). Since, *inter alia*, the amended complaint is bereft of any factual allegations,

other than plaintiff's conclusory allegations, from which it may reasonably be inferred that

plaintiff's "Web Presence" has acquired secondary meaning in the relevant market, it fails to

state a plausible claim of trade dress infringement with respect to plaintiff's Website. See, e.g.

Carson Optical, Inc. v. Prym Consumer USA, Inc. 11 F. Supp. 3d 317, 344 (E.D.N.Y. 2014)

(holding that absent any factual allegations regarding "actual consumer surveys, unsolicited

media coverage or specific attempts to plagiarize the trade dress at issue" the second amended

complaint failed to support a reasonable inference that the plaintiff's trade dress acquired

secondary meaning); Morgans Grp. LLC v. John Doe Co., No. 10-cv-5225, 2012 WL 1098276,

at * 7 (S.D.N.Y. Mar. 31, 2012) ("[C]onclusory allegations of sales success cannot support a

finding of secondary meaning.") Accordingly, the branch of defendants' motion seeking

dismissal of so much of plaintiff's trade dress infringement claim (fifth claim for relief) as

pertains to its Website pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is

granted and so much of plaintiff's trade dress infringement claim as pertains to its Website is

dismissed with prejudice for failure to state a claim for relief.


4. Copyright Infringement Claim

"In order to demonstrate copyright infringement, a plaintiff must show ownership of a

valid copyright and copying of the protectable elements of the copyrighted work." Scholz

Design, Inc. v. Sard Custom Homes, LLC, 691 F.3d 182, 186 (2d Cir. 2012); see also Zalewski v.

Cicero Builder Dev., Inc., 754 F.3d 95, 100 (2d Cir. 2014) ("In order to make out a claim of

copyright infringement * * * a plaintiff must establish three things: 1) that his work is protected by a valid copyright, 2) that the defendant copied his work, and 3) that the copying was wrongful."); Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc., 338 F.3d 127, 131 (2d Cir. 2003) ("Copyright infringement is established when the owner of a valid copyright demonstrates unauthorized copying." (quotations and citation omitted)). Courts in this Circuit have held that "[t]o meet the requirements of Rule 8(a) [of the Federal Rules of Civil Procedure], a complaint must plead with specificity the acts by which a defendant has committed copyright infringement[,]" Transcience Corp. v. Big Time Toys, LLC, 50 F. Supp. 3d 441, 448-49 (S.D.N.Y. 2014); accord Patrick Collins, Inc. v. John Doe 1, 945 F. Supp. 2d 367, 374 (E.D.N.Y. 2013); Elektra Entm't Grp., Inc. v. Barker, 551 F. Supp. 2d 234, 238 (S.D.N.Y. 2008), by alleging "1) which specific original works are the subject of the copyright claim, 2) that plaintiff owns the copyrights in those works, 3) that the copyrights have been registered in accordance with the statute, and 4) by what acts during what time the defendant infringed the copyright." Kelly v. L.L. Cool J., 145 F.R.D. 32, 36 (S.D.N.Y. 1992), aff'd, 23 F.3d 398 (2d Cir. 1994) (citing cases); accord Lefkowitz v. McGraw-Hill Global Educ. Holdings, LLC, 23 F. Supp. 3d 344, 352 (S.D.N.Y. 2014); Warren, 952 F. Supp. 2d at 616; Patrick Collins, 945 F. Supp. 2d at 374. Moreover, "[p]ost- Iqbal, the courts in this Circuit considering motions to dismiss copyright claims have held that a plaintiff with a valid copyright must allege that '(1) defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectable elements of plaintiff's.'" Ritani, LLC v. Aghjayan, 880 F. Supp. 2d 425, 441-42 (S.D.N.Y. 2012) (quoting LaChapelle v. Fenty, 812 F.Supp.2d 434, 438 (S.D.N.Y.2011)); accord Lambertini v. Fain, No. 12-cv-3964, 2014 WL

4659266, at * 4 (E.D.N.Y. Sept. 17, 2014); see also Peter F. Gaito Architecture, LLC v. Simone

Dev. Corp., 602 F.3d 57, 63 (2d Cir. 2010) ("In order to establish a claim of copyright

infringement, a plaintiff with a valid copyright must demonstrate that: (1) the defendant has

actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity

exists between the defendant's work and the protectible elements of plaintiff's." (quotations and

citation omitted)). "[S]ubstantial similarity * * * must be to that which is protected in the

plaintiff's work." Tufenkian, 338 F.3d at 131; see also Zalewski, 754 F.3d at 101 ("[T]he term

'substantial similarity' is properly reserved for similarity that exists between the protected

elements of a work and another work. * * * [S]imilarity that relates to unprotected elements * * *

is referred to as 'probative similarity.'" (citation omitted)). "[T]he failure to plead facts

regarding how the [works] are 'substantially similar,' including identifying the protectable

elements of [the plaintiff's work] as part of its claim, will result in the dismissal of the copyright

claim." Ritani, 880 F. Supp. 2d at 442.

Nonetheless, "[a]t this stage of the litigation, a plaintiff need only give the opposing party

fair notice of what the plaintiff's claim is and the grounds on which it rests." Ritani, 880 F.

Supp. 2d at 440 (quotations, brackets and citation omitted). "Neither Twombly nor Iqbal

requires a plaintiff in a copyright infringement action to plead specific evidence or extra facts

beyond what is needed to make the claim plausible." Id. (quotations and citation omitted).

"Thus, once there has been notice of the claim, factual and evidentiary issues should be

developed during discovery." Id. (quotations, alterations and citation omitted).

The allegations in the amended complaint, together with the exhibits attached thereto,

satisfy the first three (3) pleading requirements for stating a plausible copyright infringement

claim. Specifically, plaintiff alleges, *inter alia*, that its "website entitled I Love Kickboxing Carle Place, located on the internet at www.ilovekickboxingcarleplace.com," (Am. Compl., ¶ 10), is subject to protection under the Copyright Act, and that it "received a Certificate of Registration for the Website," (id., ¶ 13), which is attached to the amended complaint as Exhibit A. Since, *inter alia*, there is a rebuttable presumption that "[a] certificate of copyright registration is prima facie evidence of ownership of a valid copyright," Scholz Design, 691 F.3d at 186, plaintiff has established that it owns a valid copyright in the "new and revised text, editing, additional artwork, [and] additional photographs" in its "Ilovekickboxing Carles Place Website" that were not included in the "previously published version of [its] website," (Am. Compl., Ex. A). See, e.g. Patrick Collins, 945 F. Supp. 2d at 374; Gusler v. Fischer, 580 F. Supp. 2d 309, 318 (S.D.N.Y. 2008) (finding that the copyright registration certificate attached to the complaint satisfied the first three [3] pleading requirements for a copyright infringement claim).

Plaintiff further alleges, *inter alia*, (1) that "[s]ubsequent to the issuance of the Website's copyright certificate," (Am. Compl., ¶ 15), i.e., on or after October 2, 2012, (see id., Ex. A), defendants "infringed upon [its] copyright by adapting [its] Website content * * * and releasing said adaptation * * * on its company website, located on the Internet at [ILove2Kickbox.com][,]"[2] (Id., ¶ 15; see id., ¶ 2 and Ex. B); (2) that it "became aware of

---

[2]  Contrary to plaintiff's contention, the amended complaint cannot be read to state a claim of copyright infringement with respect to defendant's website located at www.atomickickboxing.com. Plaintiff refers to defendants' www.atomickickboxing.com website only under the heading "Trade Dress Infringement Websites" in the amended complaint, (see Am. Compl., ¶¶ 36-40), and specifically refers only to either "ILove2Kickbox.com" or "the Infringing Domain Name," which is identified in the amended complaint as "the domain name ILove2Kickbox.com," (Am. Comp., ¶ 2), in the factual allegations under the heading "Copyright

[d]efendants' * * * [infringement] on or about June 2, 2014," (id., ¶ 16); and (3) that defendants' Internet hosting provider "suspended" defendants' purportedly infringing website on June 3, 2014. (Id., ¶¶ 17-18). Thus, the amended complaint sufficiently identifies the time period during which defendants' infringement of plaintiff's copyright may have occurred, i.e., on or after October 2, 2012 until June 3, 2014. See, e.g. Lefkowitz, 23 F. Supp. 3d at 354; Gusler, 580 F. Supp. 2d at 318-19; see also Young-Wolff v. McGraw-Hill Sch. Educ. Holdings, LLC, No. 13-cv-4372, 2015 WL 1399702, at * 4 (S.D.N.Y. Mar. 27, 2015) (holding that Rule 8 of the Federal Rules of Civil Procedure requires only "fair notice of the approximate time period of [d]efendants' alleged infringement.")

Moreover, "it is not fatal for a plaintiff's copyright claim if the complaint fails to specify how [its] particular [work] has been infringed." Lefkowitz, 23 F. Supp. 3d at 353 (quotations and citation omitted); accord Warren, 952 F. Supp. 2d at 618; see also Young-Wolff, 2015 WL 1399702, at * 3. In any event, plaintiff attached to the amended complaint a copy of defendants' allegedly infringing website, with the elements it claims that defendants copied from its Website highlighted in yellow. (Am. Compl., Ex. B).

"While the question of substantial similarity is typically a question of fact, 'in certain circumstances, it is entirely appropriate for a district court to resolve that question as a matter of law, either because the similarity between two works concerns only non-copyrightable elements

---

Infringement" in the amended complaint, (see id., ¶¶ 10-18). Since it may be presumed that the separation of the claims was intentional, the amended complaint does not provide fair notice to defendants of any copyright infringement claim pertaining to its www.atomickickboxing.com website. In any event, since the amended complaint is bereft of any allegations regarding the time period during which defendants' allegedly infringed upon plaintiff's copyright with the www.atomickickboxing.com website, it fails to state a plausible claim of copyright infringement with respect to that website.

of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar.'" Ritani, 880 F. Supp. 2d at 442 (quoting Peter F. Gaito, 602 F.3d at 63). Although the court may consider the similarity between the works at issue in connection with a motion to dismiss when the works in question are attached to a plaintiff's complaint, see Peter F. Gaito, 602 F.3d at 64, there is no requirement, under Rule 8(a) of the Federal Rules of Procedure or elsewhere, that the plaintiff attach the works in question to the complaint in order to state a plausible claim for copyright infringement. Accordingly, and contrary to defendants' contention, plaintiff's failure to attach "screen shots" or any images from its Website as it existed in June 2014, when defendants are alleged to have copied it, is not fatal to its copyright infringement claim at the pleadings stage.[3] Thus, dismissal is appropriate in this case only if "the similarity between [the parties' websites] concerns only non-copyrightable elements of [] plaintiff's work[.]" Ritani, 880 F. Supp. 2d at 442.

"The mere fact that a work is copyrighted does not mean that every element of the work may be protected." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc., 499 U.S. 340, 348, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991). "To qualify for copyright protection, a work must be original—that is, it must be independently created by the author and possess 'at least some minimal degree of creativity.'" Scholz Design, 691 F.3d at 186 (quoting Feist Publ'ns, 499 U.S. at 345, 111 S. Ct. 1282); accord Mattel, Inc. v. Goldberger Doll Mfg. Co., 365 F.3d 133, 135 (2d Cir. 2004); see also Zalewski, 754 F.3d at 102 ("A fundamental rule of copyright law is that it protects only 'original works of authorship,' those aspects of the work that originate with the author himself."

---

[3] The fact that plaintiff does not attach any images of its Website to its amended complaint does not necessarily mean that plaintiff will be unable to establish the elements that its Website contained, i.e., how its Website appeared, in June 2014, as suggested by defendants.

(quoting 17 U.S.C. § 102(a))). Thus, a work may be entitled to copyright protection "so long as [it] was in fact created by its author, notwithstanding lack of creativity * * * and [the] absence of anything strikingly unique or novel[.]" Mattel, 365 F.3d at 135 (quotations and citations omitted).

However, "[t]he protection that flows from * * * a copyright is * * * quite limited[,]" Mattel, 365 F.3d at 135, insofar as "[t]he copyright does not protect ideas; it protects only the author's particularized expression of the idea." Id. at 135-36; see also Peter F. Gaito, 602 F.3d at 67 ("In a copyright action, * * * the similarity between two works must concern the expression of ideas, not the ideas themselves.") "It is universally true, * * * that even works which express enough originality to be protected also contain material that is not original, and hence that may be freely used by other designers." Tufenkian, 338 F.3d at 132; see also Feist, 499 U.S. at 348, 111 S. Ct. 1282 ("[C]opyright protection may extend only to those components of a work that are original to the author."); Zalewski, 754 F.3d at 100-01 ("Not every portion or aspect of a copyrighted work is given copyright law's protection. Copying these aspects of a work is not wrongful[.] * * * When an original work contains many *un* protected [sic] elements, * * * a close similarity between it and a copy may prove only copying, not wrongful copying[] * * * because the similarity may derive only from these unprotected elements.") Thus, the court must "determine whether any alleged similarities are due to protected aesthetic expressions original to the allegedly infringed work, or whether the similarity is to something in the original that is free for the taking." Peter F. Gaito, 602 F.3d at 67 (quotations and citation omitted).

"The standard test for substantial similarity between two items is whether an ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard the aesthetic appeal as the same." Peter F. Gaito, 602 F.3d at 66 (quotations, brackets and

citation omitted); accord Zalewski, 754 F.3d at 102. The court must "compar[e] the contested

design's total concept and overall feel with that of the allegedly infringed work[] * * * because

the defendant may infringe on the plaintiff's work not only through literal copying of a portion of

it, but also by parroting properties that are apparent only when numerous aesthetic decisions

embodied in the plaintiff's work of art– the excerpting, modifying, and arranging of unprotectible

components– are considered in relation to one another." Peter F. Gaito, 602 F.3d at 66

(quotations, alterations and citations omitted). In other words, the court's "inquiry necessarily

focuses on whether the alleged infringer has misappropriated the original way in which the

author has selected, coordinated, and arranged the elements of his or her work." Id. (quotations

and citations omitted); see also Feist, 499 U.S. at 349, 111 S. Ct. 1282 ("Copyright does not

prevent subsequent users from copying from a prior author's work those constituent elements

that are not original– for example [] facts, or materials in the public domain– as long as such use

does not unfairly appropriate the author's original contributions. [quotations, alterations and

citation omitted] * * * Facts, whether alone or as part of a compilation, are not original and

therefore may not be copyrighted. A factual compilation is eligible for copyright if it features an

original selection or arrangement of facts, but the copyright is limited to the particular selection

or arrangement.") Accordingly, even assuming, *arguendo*, that many of the various components

and features of plaintiff's Website that defendants allegedly misappropriated are non-protectable

concepts, ideas, phrases, facts, etc., it cannot be ascertained from the pleadings and exhibits

attached thereto whether defendants misappropriated the original way in which plaintiff selected,

coordinated, and arranged those elements of its Website.

In sum, since, *inter alia*, the amended complaint identifies plaintiff's copyright

26

infringement claim; the work that plaintiff claims was infringed, i.e., its Website; and the bases

for plaintiff's assertion that its Website was infringed, i.e., that defendants actually copied

numerous elements of plaintiff's Website as highlighted in Exhibit B to the amended complaint,

it states a plausible claim for copyright infringement against defendants.[4] See, e.g. Lefkowitz, 23

F. Supp. 3d at 353-54; Arma v. Buyseasons, Inc., 591 F. Supp. 2d 637, 644 (S.D.N.Y. 2008);

Elektra Entm't, 551 F. Supp. 2d at 238. Accordingly, the branch of defendants' motion seeking

dismissal of plaintiff's copyright infringement claim (first claim for relief) is denied.

B.     Branch of Defendants' Motion Seeking Dismissal of Store Trade Dress Claim

       1.     Consideration of Extrinsic Evidence

Rule 12(d) of the Federal Rules of Civil Procedure provides:

> "If, on a motion under Rule * * * 12(c), matters outside the
> pleadings are presented to and not excluded by the court, the
> motion must be treated as one for summary judgment under Rule
> 56. All parties must be given a reasonable opportunity to present
> all the material that is pertinent to the motion."

"Ordinarily, formal notice is not required where a party should reasonably have

recognized the possibility that the motion might be converted into one for summary judgment

and was neither taken by surprise nor deprived of a reasonable opportunity to meet facts outside

---

[4] Defendants' reliance upon the doctrines of merger and "scenes a faire" is misplaced at the pleadings stage, since those doctrines are considered to be defenses to a claim of infringement. See Oracle Am., Inc. v. Google Inc., 750 F.3d 1339, 1358 (Fed. Cir. 2014), cert. denied, 2015 WL 2473490 (June 29, 2015); Ets-Hokin v. Skyy Spirits, Inc., 225 F.3d 1068, 1082 (9th Cir. 2000) (citing Kregos v. Associated Press, 937 F.2d 700, 705 (2d Cir. 1991)); see also Hart v. Dan Chase Taxidermy Supply Co., Inc., 86 F.3d 320, 322 (2d Cir. 1996) (holding that there is a "strong preference that the question [of merger] be decided only after all the evidence of substantial similarity is before the court.")

the pleadings." Hernandez v. Coffey, 582 F.3d 303, 307 (2d Cir. 2009) (quotations, brackets and citations omitted); see also Sira v. Morton, 380 F.3d 57, 68 (2d Cir. 2004) ("A party is deemed to have notice that a motion may be converted into one for summary judgment if that party 'should reasonably have recognized the possibility' that such a conversion would occur." (quoting Gurary v. Winehouse, 190 F.3d 37, 43 (2d Cir.1999))). "The district court's conversion of a Rule 12(b)(6) motion into one for summary judgment is governed by principles of substance rather than form." M.J.M. Exhibitors, Inc. v. Stern (In re G. & A. Books, Inc.), 770 F.2d 288, 295 (2d Cir. 1985). "The essential inquiry is whether the appellant should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings." Id. "Resolution of this issue will necessarily depend largely on the facts and circumstances of each case." Id.

As noted above, during a pretrial conference before me on February 25, 2015, I, *inter alia*, denied defendants' initial motion to dismiss with leave to renew so as to afford both sides an opportunity to obtain discovery and provide facts outside the pleadings relative to plaintiff's Store Trade Dress claim. "A party cannot complain of lack of a reasonable opportunity to present all material relevant to a motion for summary judgment when both parties have filed exhibits, affidavits, counter-affidavits, depositions, etc. in support of and in opposition to a motion to dismiss * * *." M.J.M. Exhibitors, 770 F.2d at 295 (citation omitted); see also Reliance Ins. Co. v. Polyvision Corp., 474 F.3d 54, 57 (2d Cir. 2007) (finding that it was not

error for the district court to consider evidence outside of the complaint in resolving a Rule 12(c) motion "without explicitly giving notice that it was converting the Rule 12 motion to a Rule 56 motion[,]" because it was "clear from the record * * * that [the non-moving party] knew additional factual considerations were being considered and, in fact, responded with its own evidentiary submissions."); Sira, 380 F.3d at 68 ("By attaching to their motion extensive materials that were not included in the pleadings, defendants plainly should have been aware of the likelihood of such a conversion.") Under such circumstances, neither party can complain that they were deprived of an adequate opportunity to provide the materials they deemed necessary to support or respond to the motion. See Sira, 380 F.3d at 68.

Since the parties were afforded a reasonable opportunity to present materials outside the pleadings with respect to plaintiff's Store Trade Dress claim, and, in fact, submitted such materials, the branch of defendants' motion seeking dismissal of plaintiff's Store Trade Dress claim against them is treated as one for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

2.    Standard of Review

"A motion for summary judgment may properly be granted * * * only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009); see Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows

29

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.") In ruling on a summary judgment motion, the district court must first "determine whether there is a genuine dispute as to a material fact, raising an issue for trial." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotations and citations omitted); see Ricci v. DeStefano, 557 U.S. 557, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) (holding that "[o]n a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." (emphasis added) (internal quotations and citation omitted)); Vermont Right to Life Comm., Inc. v. Sorrell, 758 F.3d 118, 142 (2d Cir. 2014), cert. denied, 135 S. Ct. 949, 190 L. Ed. 2d 830 (2015) ("The role of the court on a summary judgment motion is to determine whether, as to any material issue, a genuine factual dispute exists." (quotations and citation omitted)). "On a motion for summary judgment, a fact is material if it 'might affect the outcome of the suit under the governing law.'" Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of City of New York, 746 F.3d 538, 544 (2d Cir. 2014) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

In reviewing the record to determine whether there is a genuine issue for trial, the court must "construe the evidence in the light most favorable to the nonmoving party," Dalberth v. Xerox Corp., 766 F.3d 172, 182 (2d Cir. 2014) (quotations and citation omitted), and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Smith v. County of Suffolk, 776 F.3d 114, 121 (2d Cir. 2015)

(quotations and citation omitted); accord Delaney v. Bank of America Corp., 766 F.3d 163, 168 (2d Cir. 2014). "An issue of fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Dalberth, 766 F.3d at 182 (quoting Anderson, 477 U.S. at 248, 106 S. Ct. 2505); see also Delaney, 766 F.3d at 168. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Ricci, 557 U.S. 557, 129 S. Ct. at 2677 (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)); accord Smith, 776 at 121.

"The moving party bears the initial burden of showing that there is no genuine dispute as to a material fact." CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114, 123 (2d Cir. 2013) (quotations, brackets and citation omitted); see also Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 486 (2d Cir. 2014). "[W]hen the moving party has carried its burden * * *, its opponent must do more than simply show that there is some metaphysical doubt as to the material facts * * *[,]" Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (quoting Matsushita Elec., 475 U.S. at 586-87, 106 S. Ct. 1348), and must offer "some hard evidence showing that its version of the events is not wholly fanciful." Miner v. Clinton County, New York, 541 F.3d 464, 471 (2d Cir. 2008) (quotations and citation omitted). The nonmoving party can only defeat summary judgment "by adduc[ing] evidence on which the jury could reasonably find for that party." Lyons v. Lancer Ins. Co., 681 F.3d 50, 56 (2d Cir. 2012). "'The mere existence of a scintilla of evidence in support of the [non-movant's] position

will be insufficient' to defeat a summary judgment motion[,]" <u>Fabrikant v. French</u>, 691 F.3d 193,

205 (2d Cir. 2012) (quoting <u>Anderson</u>, 477 U.S. at 252, 106 S. Ct. 2505); and "[a] court cannot

credit a plaintiff's merely speculative or conclusory assertions." <u>DiStiso v. Cook</u>, 691 F.3d 226,

230 (2d Cir. 2012); <u>see also</u> <u>Fabrikant</u>, 691 F.3d at 205 ("[C]onclusory statements or mere

allegations will not suffice to defeat a summary judgment motion." (quotations and citation

omitted)).


       3.     Plaintiff's Store Trade Dress Claim

Plaintiff alleges that its "Store Trade Dress" consists of nineteen (19) elements: (1) a

reception area with (a) a desk (i) "framed [in] sheetrock painted Benjamine [sic] Moore ["BM"]

#1061 tan," (Am. Compl., ¶ 41(a)), and (ii) "topped with absolute black granite with affront [sic]

apron[,]" (<u>id.</u>, ¶ 41(b)), (b) flooring of "*either* tan ceramic tile *or* black rolled rubber flooring

with brown & tan chips[,]" (<u>id.</u>, ¶ 41(c)) (emphasis added), and (c) "red pendant lighting * * *

[from] Home Depot fixture 'Watermelon[,]'" (<u>id.</u>, ¶ 41(d)); (2) walls *either* (a) painted "flat

black" *or* "BM #1061 tan," *or* (b) on which "Faux Brick paneling is used[,]" (<u>id.</u>, ¶ 41(e)); (3) a

"pro shop" or merchandise area with (a) a "black slat wall with tan framing[,]" (<u>id.</u>, ¶ 41(f)), (b)

that was "previously * * * [a] brick slat wall for hanging merchandise[,]" (<u>id.</u>, ¶ 41(g)), and (c)

"black track lighting[,]" (<u>id.</u>, ¶ 41(h)); (4) a lobby area with (a) red benches, (<u>id.</u>, ¶ 41(i)), and (b)

"green tall bamboo style plants[,]" (<u>id.</u>, ¶ 41(s)); (5) a training area with (a) red and black floor

mats that are "*usually* red with [a] black border[,]" (<u>id.</u>, ¶ 41(j)) (emphasis added), and (b) "high

bay acrylic [lights] hung to the 10" [sic] height on chain *or similar product*[,]" (id., ¶ 41(l))

(emphasis added); (6) *either* (a) an open ceiling painted black, *or* (b) a drop ceiling, (id., ¶ 41(k));

(7) locker rooms, bathrooms and store rooms painted "BM/Linen White[,]" (id., ¶ 41(m)); (8)

corridors with (a) "a simple chair rail at approximately 41"," (id., ¶ 41(n)), and (b) a "similar tan

wall covering" on the "lower half of [the] walls," (id., ¶ 41(o)); and (9) bathrooms with (a)

vanities of "absolute black granite with mirror finish Kohler sinks and single lever faucets

(chrome Moen)," (id., ¶ 41(p)), (b) "light glazed tile with 12" dark grey accents up the middle of

showers and behind sinks[,]" (id., ¶ 41(q)), and (c) "vanity lights over 18x30" commercial

mirrors 3 square lights with green glass covers by Jasco[,]" (id., ¶ 41(r)).

### 4.    Facts Supported by the Record

#### a.    Plaintiff's "Facility Requirements"

Colleen Tracey ("Tracey"), plaintiff's president, avers that plaintiff has a twenty-two (22)

member staff "and has spent millions of dollars in developing its ['] I Love Kickboxing'

('ILKB') brand." (Affidavit of Colleen Tracey ["Tracey Aff."], ¶¶ 2-3).  According to Tracey,

plaintiff's handbook lists twenty-one (21) pages of "Facility Requirements" that franchisees of its

ILKB brand must follow, (Id., ¶¶ 4-6, Ex. A), including the following:

> (i) in the training area, (A) one wall must (1) be covered with faux brick paneling
> from Lowe's called "Gaslight II Brick Hardboard," (2) have "a wooden box 4"
> deep and 12" high * * * painted Benjamin Moore Tan #1061" built at the bottom,
> and (3) have "Large Styrene Prints" mounted upon it as provided therein; (B)
> "[a]ll other walls around the mat area" must have a "1x12 wood base," painted
> tan; and (C) there must be (1) *either* (a) custom-printed "Dollamur [mats] from
> Swain Mats," containing a thirty-six inch (36") border and the ILKB logo in the

center *or* (b) rectangle "Zebra mats" of "red or black (no logo) * * * measur[ing] 1 meter x 2 meter," and (2) "High Bay Acrylic Lights," with "[e]ach fixture plug[ging] into a receptacle mounted on the ceiling and hang[ing] 10 feet high on a chain;"

(ii) in the lobby or reception area, (A) testimonials must be exhibited as set forth therein; (B) there must be a reception desk comprised of (1) a "2x4 metal stud [frame] with ½" sheetrock" painted "Benjamin Moore Tan #1061" situated seven feet (7') from the front frame to the wall, (2) a three-quarter inch (3/4") "absolute black granite top," fourteen inches (14") wide, overhanging the frame by three inches (3") total, with a four-inch (4") mitered apron, (3) a "flat black formica" backsplash glued to the sheetrock, (4) an eighteen-inch (18") deep work counter, and (5) a "simple black vinyl moulding [sic]" at the base; (C) there must be "an evenly spaced number of red pendant lights with CFM bulbs" called "Watermelon Pendants" from Home Depot over the reception desk; (D) the ILKB logo must be centered on a faux brick wall that has a twelve-inch (12") tan base behind the reception desk; (E) there must be a credenza "used to store the printer, literature, and hanging files in drawers," "built to size with matching granite * * * [at] the same height as the reception desk * * * [with] a total of 7ft in between the credenza and the front wall of the reception desk[;]" (F) there must be ceramic tile flooring in "Heron Beige 30x60cm #682329 with Sand Grout;" and (G) there must be (1) red fabric benches from TableChairEtc. or a "similar item" and (2) "tall green bamboo style [silk] plant[s]" in a plant box purchased from "FiberGlassDepot.com;"

(iii) there must be a "retail pro shop" or merchandise area (A) consisting of a "Black Slatwall" beginning twelve inches (12") off the floor and extending up to eighty-four inches (84") high, "framed with a 1x4" pine frame and painted Benjamin Moore Tan #1061," and (B) containing black "hanging accessories;"

(iv) in the locker rooms and bathrooms, (A) walls must be painted "Benjamin Moore Linen White #912;" and (B) bathrooms must contain (1) "Jesco WS306H-3GL Quattro" vanity lights from the "ATG Store," consisting of a three (3) "Light Line Voltage Wall Sconce, Glass," (2) a "Brushed Aluminum" hand dryer by World Smart, (3) an "Andis Quiet Turbo Hang Up" hair dryer, (4) an "Absolute Black Granite" countertop, twenty-four inches (24") deep "width to space" and five inches (5") "mitered fron [sic] apron," (5) "Kohler K-2602" mirror finish sinks with "Moen S6700 Chrome" faucets and matching "Moen Shower Bodies" in the showers, (6) one-quarter inch (1/4") "tough rubber," "brown/tan" flooring, (7) showers with (a) either a prefab base or a tiled floor with "Hollywood saddle," and (b) "Onyx Krem" tile "placed vertically with a 12" wide accent of 2x2 Silver Grey polished from ceiling to floor centered behind each faucet," and (8) eighteen-inch by thirty-inch (18"x30") mirrors, as well as particular model soap

34

dispensers and toilet paper dispensers, from Washroom Inc.; and

(v) in the corridors, (A) walls must have (1) a chair rail, the top of which is forty-
one inches (41") off the floor, painted to match the top of the wall, and (2) a vinyl
wall covering on the lower half of the wall in one (1) of two (2) colors depending
upon whether the top of the wall is painted "Linen White" or tan; and (B) there
must be "Large Action Prints" mounted as provided therein on "the tan wall
adjacent to walkway."

(Tracey Aff., Ex. A).

b.    Plaintiff's Franchises

According to Parrella, who is also the CEO of ILKB, LLC, plaintiff's "affiliate entity,"

(Affidavit of Michael Parrella ["Parrella Aff."] ¶ 10), in May 2012, the Office of the Attorney

General of the State of New York ("OAG") "launched an investigation to determine if the ILKB

'Subscription Licenses' that it was offering at the time were in fact franchise licenses pursuant to

New York General Business Law ('GBL') Article 33, § 680 et seq., known as the New York

State Franchise Sales Act' ('Franchise Sales Act')."[5]  (Id., ¶ 4).  After the OAG determined that

plaintiff "sold franchises from and within New York while it was not registered or otherwise

exempt from franchise registration[,]" (id., Ex. C at 1), plaintiff, *inter alia,* (1) sent "rescission

letters to all of its licensees providing [them] the option to convert to franchisees at their sole

discretion[,]" or to "decline the franchisee offer and continue operating under their previously

entered into Subscriber Agreement[,]" pursuant to Section 691(2) of the New York General

---

[5] The issue involved in the OAG's investigation was whether plaintiff "sold franchises
from or in New York State without satisfying the pre-requisite of registering its franchise
offering with the OAG or having an exemption from franchise registration[,]" in violation of the
Franchise Sales Act.  (Parrella Aff., Ex. C at 1).

Business Law, (id., ¶¶ 5-6)[6]; and (2) was prohibited from offering subsequent ILKB licenses, and could only offer ILKB franchises, thereafter. (Id., ¶ 6). According to plaintiff, as a result, "there now exist ILKB Licensees (i.e. those grandfathered in [pursuant to the OAG's Assurance of Discontinuance], Express Franchisees, and Full Franchisees locations[.]" (Id., ¶ 8). In total, plaintiff has identified approximately one hundred fifty (150) of its licensees and/or franchisees. (Id., Ex. E).

According to Parrella, (1) plaintiff's "[l]icensees were never required to conform to [its] ILKB trade dress because, by definition, [it] only developed its trade dress requirements as part of the OAG agreement[,]" (Parrella Aff., ¶ 9); (2) as part of plaintiff's "transition to a Full franchisee model ('Full Model'), [it], through its affiliate entity ILKB, LLC, initially offered an Express licensee model ('Express Model') to entities that already had existing locations and therefore found it economically infeasible to 'build out' the equivalent of a Full Model[,]" (Parrella Aff., ¶ 10); (3) although not explicitly stated in the Express Contract itself, pursuant to an oral agreement between plaintiff and its franchisees, the "Express Model franchisees were not required to follow [plaintiff's] trade dress[,]" (id.); (4) plaintiff "stopped offering its Express Model in July 2013, * * *[,]" (id.); and (5) "[a]ll Full Model franchisees are required to follow [plaintiff's] trade dress as contained in its trade dress manual[,]" (Parrella Aff., ¶ 11). Plaintiff identifies sixty-seven (67) franchise locations that purportedly follow its Express Model and only twenty-five (25) franchise locations, four of which are apparently owned by Parella himself, that are "Full Model" franchisees. (Id., Ex. E).

---

[6] Twelve (12) of plaintiff's licensees accepted its rescission offer. (See Parrella Aff., Ex. E).

c.    Photographs of Plaintiff's Franchises

In March 2015, Eddie Cayer, Jr. ("Cayer"), a photographer retained by defendants,

inspected and photographed three (3) of plaintiff's franchises, located at 1400 Oaklawn Avenue,

Cranston, Rhode Island ("plaintiff's Cranston franchise"); 45 Riverside Avenue, Medford,

Massachusetts ("plaintiff's Medford franchise"); and 24 North Street, Randolph, Massachusetts

("plaintiff's Randolph franchise"), respectively, as well as defendants' facility, located in

Cranston, Rhode Island. (Declaration of Eddie Cayer Jr. in Further Support of Defendants'

Motion to Dismiss the Amended Complaint ["Cayer Decl."], ¶¶ 1-6). Plaintiff's Cranston

franchise, presumably the closest facility to defendant's, is identified as a "Full" franchise, (see

Parrella Aff., Ex. E), whereas its Medford and Randolph franchises are identified as "Express"

franchises. (See id.)

Also in March 2015, Brian Glantz ("Glantz"), a photographer retained by plaintiff,

photographed another of plaintiff's "full" franchises, located at 20 Commerce Way, Seekonk,

Massachusetts ("plaintiff's Seekonk franchise"), as well as defendants' facility. (Affidavit of

Brian Glantz ["Glantz Aff."], ¶ 4).


i.    Plaintiff's Cranston Franchise

The photographs of plaintiff's Cranston franchise reveal, *inter alia*, that it complies with

plaintiff's "Facility Requirements" set forth above insofar as, *inter alia*, (1) the lobby/reception

area contains, *inter alia*, (a) a red bench, (b) a tall, "bamboo style" plant in a square planter, (c) a

brick or faux brick wall with a tan base, (d) a merchandise area with a black slat wall, (e) a tan

reception desk with a black base, and (f) four (4) red pendant lights hanging over or near the

reception desk; and (2) the training area (a) is near (i) a faux brick paneled wall upon which are

mounted "Large Styrene Prints" and (ii) a solid tan wall upon which are mounted "Large Action

Prints," and (b) contains a red mat with a black border. (Cayer Decl., Ex. A). However, the floor

in the lobby/reception area is not comprised of ceramic tile in "Heron Beige 30x60cm #682329

with Sand Grout," as required by plaintiff's Facility Requirements, compare Tracey Aff., Ex. A,

with Cayer Decl., Ex. A, nor of "black rolled rubber flooring with brown & tan chips." (Am.

Compl., ¶ 41(c)). Rather, the floor appears to consist of striped carpet tiles in various shades and

sizes of beige, grey and brown. (See Cayer Decl., Ex. A). In addition, the reception desk is "free

standing," i.e., the front frame of the reception desk is not seven feet (7') from a faux brick-

paneled wall, and has a black speckled counter top, not the "absolute black" top required under

plaintiff's Facility Requirements. (Id.) Moreover, the ILKB logo is centered on the face of the

reception desk, not on a faux brick wall behind the reception desk as set forth in plaintiff's

Facility Requirements. (Id.)

  With respect to the training area in plaintiff's Cranston franchise, there is no four-inch by

twelve-inch (4"x12") wooden box, painted tan, at the base of the faux brick wall; nor is there a

tan, "1x12 wood base" on the solid black wall abutting the mat area. (See Cayer Decl., Ex. A).

Moreover, there are no "High Bay Acrylic Lights" hanging from chains, or a similar item, over

the training area. (Id.) Rather, the lighting in the training area in the Cranston facility is

provided by what appears to be recessed fluorescent lights. (Id.) In addition, although the mat is

red with a black border, it is surrounded by a wooden frame and it does not appear to contain

plaintiff's logo in the center. (Id.)

  Furthermore, the black slat wall in the merchandise area does not begin twelve inches

(12") off the floor, nor is it "framed with a 1x4" pine frame painted Benjamin Moore Tan #1061;" and there is no chair rail or vinyl wall covering on any wall exhibited in the photographs of plaintiff's Cranston franchise as set forth in plaintiff's Facility Requirements. (Cayer Decl., Ex. A).

With respect to the bathroom in plaintiff's Cranston franchise, although the walls may be painted "Benjamin Moore Linen White," or a similar color, *inter alia*, it does not contain the vanity lights, hand dryer, hair dryer, counter, sinks, floor or mirrors set forth in plaintiff's Facility Requirements. Compare Tracey Aff., Ex. A, with Cayer Decl., Ex. A. Indeed, it does not appear that the bathroom in plaintiff's Cranston franchise is consistent in any respect with plaintiff's Facility Requirements, notwithstanding that it is purportedly a "Full Model" franchise required to comply with plaintiff's purported trade dress as set forth therein.

ii.    Plaintiff's Medford Franchise

Plaintiff's Medford franchise does not appear to comply with plaintiff's Facility Requirements or trade dress in any respect. (See Cayer Decl., Ex. B). For example, there are tan or beige arm chairs, wooden benches and/or red plastic chairs without arms, not red benches, on which patrons may sit. (Id.) There are various awards, photographs, trophies and posters displayed on shelves and the walls in the facility, but no "Large Styrene Prints" or "Large Action Prints" mounted upon the walls as provided in plaintiff's Facility Requirements. (Id.) The floor in what is presumably the lobby area appears to be blue carpeting, not beige ceramic tiling, (id.), and the reception desk consists of a glass display case on one side, in which various merchandise is displayed; a black bookcase; and a red, not a black, "credenza." (Id.) There is no "absolute

39

black" granite counter top on, no logo behind, no testimonials near, and no red pendant lights hanging over the reception desk as set forth in plaintiff's Facility Requirements. (Id.) Moreover, the floor under and near the reception desk appears to be green or grey carpeting, not ceramic tiling. (Id.) In addition, although there are two (2) small potted plants atop the reception desk, there are no "tall, green bamboo style [silk] plants" depicted anywhere in the photographs. (Id.)

There are two (2) training areas in plaintiff's Medford franchise: one on the main level and one on a lower floor. With respect to the training area on the main level, one (1) wall is painted what appears to be white or off-white and has a "simple black molding" at the base and two (2) large pictures of "ninjas" painted on it; another wall is covered by mirrors; and the mats are yellow and red. (Cayer Decl., Ex. B). The walls on the far side of the facility on the main level are painted red. (Id.) With respect to the training area on the lower level, one (1) of the walls is painted what appears to be yellow from the ceiling to about halfway to the floor and blue from that halfway point to the floor; the other wall is painted what appears to be yellow and has a black base and two (2) large pictures of black "throwing stars" painted on it; and the mats are red and blue. (Id.) There are no "High Bay Acrylic Lights" hanging from chains or a similar item in either training area. (Id.)

There are no walls covered in faux brick paneling, painted black or containing a chair rail or vinyl covering anywhere in the Medford franchise, (Cayer Decl., Ex. A), nor is there a black slat wall or black track lighting in the merchandise area of that franchise. (Id.) Rather, merchandise is either displayed in the display case forming one side of the reception desk or on what appears to be a wire fixture hanging near the ceiling on a wall painted red and either white or off-white on the main level. (Id.)

40

Furthermore, the "locker" or changing room in the Medford franchise has walls painted blue, not "Linen White," and contains, *inter alia*, four (4) lockers painted what appears to be the same color blue. (Cayer Decl., Ex. B). The bathrooms contain, *inter alia*, a single white sink with silver faucets and no counter, and walls painted either what appears to be green in the women's bathroom or red in the men's bathroom, not "Benjamin Moore Linen White." (Id.) The bathrooms do not contain showers, nor the vanity lights, hand dryer, hair dryer, counter, sinks, floor or mirrors set forth in plaintiff's Facility Requirements. Compare Tracey Aff., Ex. A, with Cayer Decl., Ex. B. Accordingly, plaintiff's Medford franchise does not appear to be consistent in any respect with either plaintiff's claimed Store Trade Dress, as purportedly set forth in its Facility Requirements, or with the overall appearance of plaintiff's Cranston franchise.

### iii.    Plaintiff's Randolph Franchise

Plaintiff's Randolph franchise also does not appear to comply with plaintiff's Store Trade Dress or Facility Requirements in any respect. For example, the reception area has a wood floor with black area mats; a red and white wall and half wall; a tan slatwall; and a reception desk painted blue with red trim and containing a blue and white speckled Formica counter top. (Cayer Decl., Ex. C). There is no granite counter top, tan desk, logo, red pendant lights or tall, "bamboo style" silk plants in the reception area, and there are black plastic arm chairs with blue or green cushions and black and blue wooden benches, not red benches, on which patrons may sit. (Id.)

There is no black slat wall, wood framing, black "hanging accessories," or black track lighting in the merchandise area of the Randolph franchise. (Cayer Decl., Ex. C). The training

41

area consists of alternating rows of red and blue mats, abutted by two (2) half walls painted white or off-white with a red top, and one wall consisting of faux brick paneling containing a simple black base and top molding. (Id.) However, there is no four-inch by twelve-inch (4"x12") tan wooden box at the base of the faux brick wall and no "High Bay Acrylic Lights" hanging from chains or a similar item in the training area. (Id.) Rather, the lighting in the training area is provided by what appears to be recessed fluorescent lights. (Id.) There are no chair rails or vinyl coverings on any of the walls depicted in the photographs of plaintiff's Randolph facility. (Id.)

There is a tan patterned carpet in the changing areas in the bathrooms, as well as in a corridor containing a small palm tree. (Id.) The bathrooms contain, *inter alia*, a single white sink with a silver faucet and no counter and either tan and white tiles on the floor and walls in the men's bathroom, or pink and white tiles on the floor and walls in the women's bathroom. (Cayer Decl., Ex. C). The bathrooms do not contain showers, nor the vanity lights, hand dryer, hair dryer, counter, sinks, floor, mirrors or soap dispensers set forth in plaintiff's Facility Requirements. Compare Tracey Aff., Ex. A, with Cayer Decl., Ex. C. Accordingly, plaintiff's Randolph franchise does not appear to be consistent in any respect with plaintiff's claimed Store Trade Dress, as purportedly set forth in its Facility Requirements, nor with the overall appearance of either plaintiff's Cranston franchise or its Medford franchise.


iv.     Plaintiff's Seekonk Facility

Plaintiff's Seekonk franchise complies with plaintiff's Facility Requirements insofar as, *inter alia*, (1) the lobby/reception area contains (a) red benches, (b) a brick or faux brick wall with a tan base, (c) a merchandise area consisting of a black slat wall that appears to begin

42

approximately twelve inches (12") from the floor and a tan frame mounted on a faux brick paneled wall, (d) a tan reception desk with an "absolute black" granite counter top with "affront apron," and (e) red pendant lights hanging over or near the reception desk; and (2) the training area (a) is bordered by (i) a faux brick paneled wall with an approximate four-inch by twelve-inch (4"x12") tan wooden box at the base, upon which are mounted "Large Styrene Prints;" (ii) a tan wall with a darker tan chair rail and base, upon which are mounted "Large Action Prints;" and (iii) a solid black wall, and (b) contains a red mat with a black border and plaintiff's logo in the center. (Glantz Aff., Ex. A). Moreover, although the floor in the lobby/reception area is not comprised of ceramic tile in "Heron Beige 30x60cm #682329 with Sand Grout," as required by plaintiff's Facility Requirements, compare Tracey Aff., Ex. A, with Glantz Aff., Ex. A, it does appear to be comprised of "black rolled rubber flooring with brown & tan chips," (Am. Compl., ¶ 41(c)).

However, the front frame of the reception desk is not seven feet (7') from a faux brick-paneled wall; there is a tan, not a black, base on the reception desk; there is no "bamboo style" silk plant in the lobby or reception area; and the ILKB logo is not displayed anywhere behind, or even near, the reception desk. (Glantz Aff., Ex. A). Rather, there are windows overlooking the parking lot behind the reception desk. (Id.)

With respect to the training area in plaintiff's Seekonk franchise, there is no tan, "1x12 wood base" on the solid black wall abutting it, (see Glantz Aff., Ex. A), nor any "High Bay Acrylic Lights" hanging from chains or a similar item over the mat area, as required by the Facility Requirements. (Id.) Rather, the lighting in the training area is provided by what appears to be recessed fluorescent lights. (Id.)

Although plaintiff claims that certain features of its bathrooms and locker rooms comprise elements of its Store Dress, it does not provide photographs of those areas in its Seekonk franchise. Accordingly, plaintiff's Seekonk franchise does not appear to be consistent with all elements of plaintiff's claimed Store Trade Dress, as purportedly set forth in its Facility Requirements, nor with the overall appearance of plaintiff's Cranston, Medford and Randolph franchises.

### d.    Defendants' Facility

According to Burke, from April 2011 to April 2014, defendants were licensees of plaintiff's website and trademarks and paid plaintiff one hundred forty-nine dollars ($149.00) per month "for the right to use Plaintiff's website content." (Declaration of John Jacob Burke in Further Support of Defendants' Motion to Dismiss the Amended Complaint ["Burke Decl."], ¶¶ 4-5). As licensees, defendants were not required to follow plaintiff's design specifications and did not do so in setting up their facility in Cranston, Rhode Island. (Id., ¶ 6).

Burke contends that after approximately three (3) years of operating under the licensing arrangement, plaintiff unexpectedly "'terminated' the license by text message," resulting in their "ILKB landing page [www.ilovekickboxingcranston.com] * * * [being] taken down[,]" (Burke Decl., ¶ 7), but a few days later, "the landing page * * * was up and running again with a new address in the footer, [and] a new location in Cranston, Rhode Island opened by a different individual who had contacts with Plaintiff." (Id.) According to Burke, "[t]he moment [he] launched a new website, * * * [p]laintiff filed this lawsuit," (id., ¶ 8), so he "began operating [his] kickboxing gym under the name Atomic Kickboxing." (Id., ¶ 9). In October 2014, Burke

"began building out the space where the kickboxing classes would be held[,]" (id., ¶ 10), but once plaintiff "raised the issue of filing a trade dress infringement claim, [he] ceased work on the facility to await the Court's resolution of the issue[,]" (id., ¶ 15).

According to Burke, he "ordered [his] mats from one of the two most popular mat manufacturers in the industry[,]" and "the tatami style mat [he] use[s] * * * is commonly used in the industry for kickboxing training areas[] [and] is only made by two manufacturers." (Burke Decl., ¶ 12). In addition, Burke contends (1) that "the red and black color scheme that [he] chose for the mats is a very common color scheme used in a wide range of kickboxing martial arts gym facilities," (id.); (2) that the tan walls in his facility are painted with a "custom color * * * known as Mesa Tan[] * * * not [] the BM 1061, Benjamin Moore, Brunswick Beige * * *[,]" (id., ¶ 13); and (3) that although one of the walls in his facility is covered with faux brick paneling, "the use of faux brick paneling is a common feature in martial arts gyms[,]" (id., ¶ 14).

### e.    Photographs of Defendants' Facility

The training area of defendants' facility contains (a) a mat that is predominantly red, with two (2) rows of black toward the center, upon which heavy bags containing defendants' "Atomic Kickboxing" logo are situated; (b) one wall painted "Mesa Tan" from floor to ceiling, with defendants' "Atomic Kickboxing" logo mounted in the center; (c) another wall covered with faux brick paneling extending from the floor to about halfway to the ceiling, and painted solid black from that halfway point to the ceiling; and (d) another wall painted black and containing four (4) large windows. (Cayer Decl., Ex. D; Glantz Aff., Ex. A). There is no four-inch by twelve-inch (4"x12") tan wooden box at the base of the faux brick wall in the training area, nor any "High

45

Bay Acrylic Lights" hanging from chains or a similar item in that area. (Cayer Decl., Ex. C).

Rather, the lighting in the training area is provided by fluorescent lights hanging from the ceiling by what appears to be chains "approximately 10"-14" long * * *." (Glantz Aff., ¶ 5[l] and Ex. A).

The lobby/reception area of defendants' facility contains, *inter alia*, (a) two (2) red vinyl couches with arms, one situated against a wall painted tan and containing a simple black molding at the base, and the other against a faux brick-paneled wall without a base; (b) a reception desk painted the same tan color with the same black molding at the base, and containing a black and gray speckled, not an "absolute black," counter top; and (c) small lockers in an upside down "U" shape, with a bar for hanging coats across the middle situated against the faux brick-paneled wall across from, not behind, the reception desk. (Cayer Decl., Ex. C; Glantz Aff., Ex. A). There is no lighting, much less "red pendant lighting," over the reception desk, (Glantz Aff., ¶ 5[d]), and no tall, bamboo-style plants in defendants' lobby area. (Id., ¶ 5[s]). Moreover, the wall behind defendants' reception desk is painted the same tan color as the desk itself and is not covered by faux brick paneling. (Id., Ex. A).

The merchandise area in defendants' facility consists of a tan slat wall containing black and silver hanging accessories mounted on the upper half of the tan wall, not the faux brick-paneled wall, below which are situated red plastic cubbies containing additional merchandise for purchase. (Cayer Decl., Ex. C; Glantz Aff., Ex. A). There is no track lighting, much less "black track lighting," over the merchandise area in defendants' facility. (Glantz Aff., ¶ 5[h]).

There are no photographs depicting any bathrooms or changing rooms in defendants' facility, although there are photographs depicting various areas of the facility that were under

46

construction at the time of the inspection. (Cayer Decl., Ex. C; Glantz Aff., ¶¶ 5[n]-[r]).

### 5.    Analysis

#### a.    Distinctiveness of Store Trade Dress

"Trade dress traditionally refers to the packaging or labeling of a product, but may also include the appearance of the product itself." Walt Disney Co. v. Goodtimes Home Video Corp., 830 F. Supp. 762, 766 (S.D.N.Y. 1993); accord Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs., Inc., 871 F. Supp. 709, 722 (S.D.N.Y. 1995); see also Landscape Forms, 113 F.3d at 381 ("[T]rade dress may protect the 'overall look' of a product."); Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co., 292 F. Supp. 2d 535, 541 (S.D.N.Y. 2003) ("The scope of trade dress claims has expanded to include the totality of any elements in which a product or service is packaged or presented." (quotations and citation omitted)). Accordingly, the trade dress of a business may include the overall appearance of its business facilities, e.g., its interior design, layout or decor. See, e.g. Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC, 813 F. Supp. 2d 489, 539-40 (S.D.N.Y. 2011) (finding that the plaintiff had a recognizable trade dress in the layout and interior decor of its indoor exercise facility); Innovative Networks, 871 F. Supp. at 722 (involving a trade dress claim based upon the design and construction of the plaintiff's business centers to resemble ticket counters in an airport).

Since "a trade dress that seeks to protect an idea, a concept, or a generalized type of appearance is generic, not distinctive, and therefore not subject to trade dress protection[,]"

Maharishi Hardy, 292 F. Supp. 2d at 542 (quotations and citation omitted); see also Pure Power, 813 F. Supp. 2d at 538 ("A generic trade dress is never protectable"), plaintiff must establish "that the appearance of its several products [i.e., its franchises] is sufficiently distinct and unique to merit protection as a recognizable trade dress." Landscape Forms, 113 F.3d at 380; accord Regal Jewelry Co., Inc. v. Kingsbridge Int'l, Inc., 999 F. Supp. 477, 486 (S.D.N.Y. 1998). "Initially, this burden requires the plaintiff to articulate a specific trade dress, * * * and then to demonstrate that it has, in fact, consistently used that trade dress." Regal Jewelry, 999 F. Supp. at 486. Thus, since plaintiff is claiming a trade dress based upon the appearance of its multiple franchises, it must establish that the overall look in each of its franchises is consistent. See Yurman Design, 262 F.3d at 116 (quoting Walt Disney, 830 F. Supp. at 766 ); GTFM, Inc. v. Solid Clothing, Inc., 215 F. Supp. 2d 273, 299 (S.D.N.Y. 2002); see also Maharishi Hardy, 292 F. Supp. 2d at 542 ("The broad category of distinctiveness incorporates three related doctrines * * *: genericness, specificity, and consistency. A trade dress which is either generic, non-specific, or inconsistent among its products cannot be distinctive.") "If a plaintiff can not [sic] establish that its [appearance] ha[s] a consistent overall look, the trade dress that is allegedly infringed does not exist." Casa Editrice Bonechi, S.R.L. v. Irving Weisdorf & Co., Ltd., No. 95 Civ. 4008, 1997 WL 749388, at * 4 (S.D.N.Y. Dec. 3, 1997).

"Although each element of a trade dress individually might not be inherently distinctive, it is the combination of elements that should be the focus of the distinctiveness inquiry." Jeffrey Milstein, 58 F.3d at 32; see also Wine Made Simple, 320 F. Supp. 2d at 71 ("Because in the

context of trade dress the whole can be greater than, or at least different from, the sum of its parts, it is necessary to consider the combined articulated elements of [the plaintiff's] trade dress to determine whether as an ensemble they form a distinctive presentation to consumers.") Nonetheless, although "[a] unique combination of elements may make a dress distinctive, [] the fact that a trade dress is composed entirely of commonly used or functional elements might suggest that the dress should be regarded as unprotectible or 'generic,' to avoid tying up a product or marketing idea." Yurman Design, 262 F.3d at 118 (quotations and citation omitted); see also Maharishi Hardy, 292 F. Supp. 2d at 543 ("Where the asserted trade dress extends to the 'overall look' of the combination of features comprising a product or product line, the Court must evaluate the distinctiveness and functionality of those features taken together, not in isolation. * * * Nonetheless, the fact that a trade dress is composed exclusively of commonly used or functional elements might suggest that that dress should be regarded as unprotectable or 'generic,' to avoid tying up a product or marketing idea." (quotations, emphasis and citations omitted)).

Initially, as pleaded, five (5) of the nineteen (19) elements identified by plaintiff as constituting its trade dress, i.e., the flooring, walls, layout of the floor mat, ceilings and product on which the training floor lights are held, are not even required to be uniform throughout its franchises. Moreover, it is clear from the submitted photographs that the "overall look" of plaintiff's franchises vary widely and are not uniform. Even the photographs of plaintiff's "Full Model" franchises, i.e., the Cranston and Seekonk franchises, reveal various inconsistencies

49

between the elements plaintiff claims constitutes its trade dress and the actual appearance of those franchises, as well as between the stores themselves. Given the multiple variations in the appearance of even the small sampling of plaintiff's franchises provided in the record, plaintiff's Store Trade Dress claim is "more in the nature of an unprotectable 'generalized appearance[,]'" than of the "overall look" of its stores. Casa Editrice, 1997 WL 749388, at * 4 (quoting Jeffrey Millstein, 58 F.3d at 33). In other words, plaintiff cannot demonstrate "that it has consistently applied any single avowed theme trade dress to [its multiple franchises]." Regal Jewelry, 999 F. Supp. at 487. Since, *inter alia*, the elements of plaintiff's claimed trade dress are not consistent in its franchises, plaintiff cannot establish that its "overall look" is distinctive or constitutes a protectable trade dress. See, e.g. Maharishi Hardy, 292 F. Supp. 2d at 542; Regal Jewelry, 999 F. Supp. at 486 (holding that the plaintiff's trade dress claim under the Lanham Act failed "because it ha[d] not consistently defined the elements of, or pursued the use of, a theme trade dress.")

In any event, defendants have established that their Atomic Kickboxing facility does not infringe upon plaintiff's Store Trade Dress, insofar as, *inter alia*: (1) defendants' reception desk and walls are painted a different color, i.e., Mesa Tan as opposed to Benjamin Moore "#1061 tan,"[7] (Am. Compl., ¶¶ 41(a) and (e)); (2) defendants' reception desk has a different counter top, i.e., black and gray speckled granite as opposed to "absolute black granite," (Tracey Aff., Ex. A); (3) the lobby flooring in defendants' reception area is not "heron beige" ceramic tile as set forth

---

[7] While plaintiff designates the color of its wall as "tan," the actual name of the Benjamin Moore #1061 product is "Brunswick Beige," see www.benjaminmoore.com/en-us/paint-color/, and it is described as "[t]imeless and traditional." Id.

in plaintiff's Facility Requirements, (id.); (4) defendants do not have "red pendant lighting," (id., ¶ 41(d)), over their reception desk; (5) defendants' merchandise area does not contain a "black slat wall with tan framing[,]" (id., ¶ 41(f)), nor "black track lighting[,]" (id., ¶ 41(h)); (6) defendants' lobby area has, *inter alia*, (a) red vinyl couches with arms, (see Cayer Decl., Ex. D), not red fabric benches, (see Tracey Aff., Ex. A), and (b) a small green plant that appears to be real in a tall pot or vase situated on an end table, (see Cayer Decl., Ex. D), not a "green tall bamboo style [silk] plant[]," (Am. Compl., ¶ 41(s)), in a fiberglass plant box, (see Tracey Aff., Ex. A); (7) defendants' training area has red and black floor mats, but they are not red with a thirty-six-inch (36") black border and do not have a logo in the center as set forth in plaintiff's Facility Requirements, (see Am. Compl., ¶ 41(j); Tracey Aff., Ex. A), nor is there any evidence that the pattern in which they are situated is similar to any of the training areas in plaintiff's other franchises; and (8) there are no "high bay acrylic [lights] hung to the 10" [sic] height on chain or similar product[,]" (id., ¶ 41(l); see Tracey Aff., Ex. A), in defendants' training area. In fact, the *only* indistinguishable element between defendants' facility and plaintiff's claimed Store Trade Dress is the "open ceiling painted black," (Am. Compl., ¶ 41(k)), which is generic, not set forth in plaintiff's Facility Requirements, and is pleaded as an alternative to a drop ceiling. (Id., ¶ 41(k)). Otherwise, the overall look of defendants' facility is sufficiently dissimilar from the appearance of all of plaintiff's franchises depicted in the record, as well as from the photographs depicting plaintiff's Facility Requirements. In cases involving the general appearance of a business, such as this one, "the trade dress is the overall look of the store, consisting of a

cumulation of interacting elements, and defendants do not infringe by appropriating the marketing concept, or any particular element of plaintiff's design, unless the overall dress is sufficiently similar to generate likely consumer confusion." Wine Made Simple, 320 F. Supp. 2d at 72. Moreover, "competitors cannot be prevented from employing a trade dress that is similar to but clearly different than [the plaintiff's], particularly when [the plaintiff] has failed to use that dress on many of its products * * *." Regal Jewelry, 999 F. Supp. at 488. Accordingly, pursuant to Rule 12(d) of the Federal Rules of Civil Procedure, the branch of defendants' motion seeking dismissal of plaintiff's Store Trade Dress claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is treated as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure and summary judgment is granted dismissing plaintiff's Store Trade Dress claim against defendants in its entirety with prejudice.

### b. Likelihood of Confusion

Even assuming, *arguendo*, that plaintiff's Store Trade Dress is distinctive, plaintiff cannot establish a likelihood of confusion. In this Circuit, "likelihood of confusion means a probability of confusion; it is not sufficient if confusion is merely possible." Estee Lauder, Inc. v. The Gap, Inc., 108 F.3d 1503, 1510 (2d Cir. 1997) (quotations and citation omitted); accord Star Indus., Inc. v. Bacardi & Co., Ltd., 412 F.3d 373, 383 (2d Cir. 2005); see also New York Stock Exch., Inc. v. New York, New York Hotel LLC, 293 F.3d 550, 554 (2d Cir. 2002) ("To support a finding of infringement, a plaintiff must show a probability, not just a possibility, of

confusion."); accord Streetwise Maps, Inc. v. VanDam, Inc., 159 F.3d 739, 743 (2d Cir. 1998).

Likelihood of confusion is determined by considering the following eight (8) factors set out in

Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961):

> "the strength of the prior owner's mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap between the two products, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers."

Nora Beverages II, 269 F.3d at 119 (quoting Polaroid, 287 F.2d at 495); accord Star Indus., 412

F.3d at 384.

   "When conducting a Polaroid analysis, a court should focus on the ultimate question of

whether consumers are likely to be confused." Nora Beverages II, 269 F.3d at 119 (quotations

and citation omitted). "In making this determination, a court looks to the totality of the product."

Id. "Although no one factor is necessarily dispositive, *any one factor may prove to be so*." Id.

(emphasis added). "[T]he Lanham Act must be construed in the light of a strong federal policy in

favor of vigorously competitive markets[,] * * * [and] courts must not lose sight of the

underlying purpose of the Lanham Act, which is protecting consumers and manufacturers from

deceptive representations of affiliation and origin." Id. (quotations and citations omitted).


                    i.       Strength of the Trade Dress

   "[T]he strength of a mark [or trade dress] is determined by its tendency to uniquely

identify the source of the product." Star Indus., Inc., 412 F.3d at 384; see also Patsy's Brand, Inc.

v. I.O.B. Realty, Inc., 317 F.3d 209, 218 (2d Cir. 2003) ("To determine the strength of a mark, a

court examines the mark's tendency to identify the goods sold as emanating from a particular, although possibly anonymous, source. * * * Strength of trade dress is similarly analyzed." (quotations and citations omitted)); accord Fun-Damental Too, Ltd. v. Gemmy Indus. Corp., 111 F.3d 993, 1003 (2d Cir. 1997). "Determination of strength * * * begins with inquiry as to whether the mark [or trade dress] has the inherent distinctiveness that would entitle it to protection in the absence of secondary meaning[,]" Star Indus., 412 F.3d at 384, i.e., whether the trade dress is generic, descriptive, suggestive or arbitrary and fanciful. Id. at 384-85. "Arbitrary or fanciful marks are ones that do not communicate any information about the product either directly or by suggestion[,]" Id. at 385, and are inherently distinctive. Id.

"Once a mark [or trade dress] has been classified, the second step in determining strength is to consider its degree of distinctiveness, an inquiry that concerns both the inherent inventiveness of the mark itself and the amount of third-party usage of the term [or image] as a mark [or trade dress], especially in the market in question." Star Indus., 412 F.3d at 385 (quotations and citation omitted).

Defendants have sufficiently established, *inter alia*, that other fitness and martial arts facilities offering kickboxing classes that are not affiliated in any way with the parties herein utilize many of the elements plaintiff claims constitutes its Store Trade Dress, e.g., faux brick paneling and/or red and black color schemes in their businesses.[8] See, e.g.

---

[8] "[T]he existence of similar dresses used in connection with similar products," Best Cellars Inc. v. Grape Finds at Dupont, Inc., 90 F. Supp. 2d 431, 454 (S.D.N.Y. 2000), is a factor to consider in determining the strength of the trade dress with respect to the "likelihood of confusion" element of a trade dress claim. See id. (holding that the strength of the plaintiff's

www.littleboxingclub.com (depicting a wall with similar faux brick paneling); www.9round.com (depicting a wall with similar faux brick paneling and a red and black color scheme); www.ufcgym.com (depicting a red and black color scheme). See Regal Jewelry, 999 F. Supp. at 489 ("An otherwise protectable trade dress can become generic within a particular market if the design becomes a standard or custom for the industry); Kind LLC v. Clif Bar & Co., No. 14 Civ. 770, 2014 WL 2619817, at * 3 (S.D.N.Y. June 12, 2014) ("[D]espite the tendency for trade dresses to be inherently distinctive because the whole universe of materials and designs is available for packaging, [p]laintiff's very common packaging [i.e., interior] design is not inherently distinctive." (quotations and citation omitted)); Conte v. Newsday, Inc., No. 06-cv-4859, 2013 WL 978711, at * 19 (E.D.N.Y. Mar. 13, 2013) ("[T]he fact that a similar trade dress is already being used by manufacturers of other kinds of products, may indicate that th[e] dress is no more than a concept or idea." (quoting Jeffrey Milstein, 58 F.3d at 33)). Accordingly, plaintiff cannot establish that upon consideration of its product, i.e., its kickboxing franchises, and the market in which it competes, Landscape Forms, 113 F.3d at 378, the "overall look" of its franchises served to identify the source of its product. "Notably, the only element of [plaintiff's] packaging that indicates its source, [plaintiff's ILKB] logo, is not included in the trade dress [plaintiff] seeks to protect[.]" Kind LLC, 2014 WL 2619817, at * 3. In sum, even assuming that plaintiff's Store Trade Dress is inherently distinctive, it is not particularly strong because it "does not *primarily* serve to identify the source of its product." Eastern America Trio Products, Inc. v.

---

trade dress "may be diminished by the existence of similar dresses used in connection with similar products.")

Tang Elec. Corp., 97 F. Supp. 2d 395, 411 (S.D.N.Y. 2000).

ii.     Similarity of Trade Dress

"[T]he appropriate test for similarity of trade dress is the overall impression of the products and the entirety of the trade dress, and [] a mark may not be dissected in order to prove similarity." Nora Beverages II, 269 F.3d at 122. Although "[q]uestions regarding likelihood of confusion are normally factual in nature," Universal City Studios, Inc. v. Nintendo Co., Ltd., 746 F.2d 112, 116 (2d Cir. 1984), summary judgment is "appropriate if the court is satisfied that the products or marks [or trade dress] are so dissimilar that no question of fact is presented." Id.; see also Nabisco, Inc. v. Warner-Lambert Co., 220 F.3d 43, 46 (2d Cir. 2000) ("[I]n an appropriate case, the 'similarity of the marks' factor can be dispositive and will warrant summary judgment for an infringement defendant if the court is satisfied that the . . . marks are so dissimilar that no question of fact is presented." (quotations and citation omitted)). The court's task on a motion for summary judgment is "to determine whether any reasonable trier of fact could conclude that confusion is likely." Sports Auth., Inc. v. Prime Hospitality Corp., 89 F.3d 955, 960 (2d Cir. 1996) (quotations and citation omitted).

Although there are some similarities between the appearance of plaintiff's "full" franchise and plaintiff's facility, their overall look is sufficiently different as to make the likelihood of consumer confusion unlikely. See, e.g, Eastern American Trio, 97 F. Supp. 2d at 411. In other words, the "similarity of the marks" factor is dispositive in defendants' favor insofar as "[t]he

56

cumulative effect of the[] differences in the parties' commercial presentation of their trade dress creates distinct marketplace impressions, thereby eliminating any likelihood of consumer confusion." Conte, 2013 WL 978711, at * 21; see, e.g. Eastern American Trio, 97 F. Supp. 2d at 414 (finding that the plaintiff's claim for packaging trade dress infringement failed because "[t]he strength of plaintiff's trade dress, the proximity of the products, and even plaintiff's evidence of actual confusion [were] * * * far outweighed by the fact that the overall appearance of the packaging at issue is so dissimilar.") Accordingly, and construing plaintiff's Store Trade Dress claim in light of the "strong federal policy in favor of vigorously competitive markets[,]" id., defendants have established their entitlement to summary judgment dismissing plaintiff's Store Trade Dress claim against them in its entirety with prejudice.

      C.     Plaintiff's Motion for a Preliminary Injunction

          1.     Standard

"[A] court may issue a preliminary injunction in a copyright [or trademark] case only if the plaintiff has demonstrated [1] either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation * * *[,]" Salinger v. Colting, 607 F.3d 68, 79 (2d Cir. 2010) (quotations, alterations and citation omitted); see also Zino Davidoff SA v. CVS Corp., 571 F.3d 238, 242 (2d Cir. 2009) (trademark claim); "[2] that he is likely to suffer irreparable injury in the absence of an injunction[,]" Salinger, 607 F.3d at 79-80 (quoting Winter v. Natural Res. Def. Council, 555 U.S. 7, 129 S. Ct.

365, 374, 172 L. Ed. 2d 249 (2008)); accord Zino Davidoff, 571 F.3d at 242; "[3] [that] "the balance of hardships tips in the plaintiff's favor, * * *[;] and [4] * * * that the public interest would not be disserved by the issuance of a preliminary injunction." Salinger, 607 F.3d at 80 (quotations and citations omitted); see also WPIX, Inc. v. ivi, Inc., 691 F.3d 275, 278 (2d Cir. 2012) ("In a copyright case, a district court may grant a preliminary injunction when plaintiffs demonstrate: (1) a likelihood of success on the merits; (2) irreparable harm in the absence of an injunction; (3) a balance of the hardships tipping in their favor; and (4) non-disservice of the public interest by issuance of a preliminary injunction.") Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief[,]" Winter, 555 U.S. at 22, 129 S. Ct. 365, and is "never awarded as of right." Id. at 24, 129 S. Ct. 365.


2.    Irreparable Harm

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." Faiveley Transport Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009) (quotations and citation omitted); accord Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66-67 (2d Cir. 2007). "[T]o satisfy the irreparable harm requirement, plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." Faiveley Transport, 559 F.3d at 118

58

(quotations, brackets and citation omitted)); accord Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 114 (2d Cir. 2005); see also Salinger, 607 F.3d at 81 ("The relevant harm is the harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction.") "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." Faiveley Transport, 559 F.3d at 118 (quotations, brackets and citation omitted)).

"Harm may be irreparable where the loss is difficult to replace or measure, or where plaintiffs should not be expected to suffer the loss." WPIX, 691 F.3d at 285. "The court must not * * * presume that the plaintiff will suffer irreparable harm[,] * * * and must actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the remedies available at law, such as monetary damages, are inadequate to compensate for that injury." Salinger, 607 F.3d at 80 (quotations and citation omitted); see also WPIX, 691 F.3d at 285 ("[C]ourts may no longer simply presume irreparable harm; rather, plaintiffs must demonstrate that, on the facts of the case, the failure to issue an injunction would actually cause irreparable harm.")

In assessing irreparable harm, courts should generally consider any undue delay by the plaintiff in seeking the preliminary injunction. See Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 39 (2d Cir. 1995); Environmental Servs., Inc. v. Recycle Green Servs., Inc., 7 F. Supp. 3d 260, 280 (E.D.N.Y. 2014); see also Levola v. Fischer, 403 F. App'x 564, 565 (2d Cir. Dec. 14, 2010) (summary order) (affirming the district court's finding that the plaintiff failed to

59

show an immediate danger of irreparable harm based upon his delay in seeking preliminary

relief); Transcience, 50 F. Supp. 3d at 457-58 ("It is well-established in this Circuit that delays in

moving for injunctive relief to protect copyrights and trademarks from further unauthorized use

weigh heavily against the movant." (citing cases)); Bulman v. 2BKCO, Inc., 882 F. Supp. 2d 551,

564 (S.D.N.Y. 2012) ("In the Second Circuit, delay in applying for a preliminary injunction is

one factor to be considered in determining whether a plaintiff will, in fact, suffer irreparable

harm in the absence of a preliminary injunction." (quotations and citation omitted)). "Delay in

seeking a preliminary injunction can weaken a claim of irreparable harm because 'the failure to

act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary

relief.'" Juicy Couture, Inc. v. Bella Int'l, Ltd., 930 F. Supp. 2d 489, 504 (S.D.N.Y. 2013)

(quoting Tough Traveler, Ltd. v. Outbound Prods., 60 F.3d 964, 968 (2d Cir.1995)). The Second

Circuit has "found delays of as little as ten weeks sufficient to defeat [a finding] of irreparable

harm * * *[,]" Weight Watchers Int'l, Inc. v. Luigino's, Inc., 423 F.3d 137, 144 (2d Cir. 2005),

except for when there is "good reason" for the delay, "as when a plaintiff is not certain of the

infringing activity or has taken additional time to examine the infringing product." Id. at 144-45;

see also Silber v. Barbara's Bakery, Inc., 950 F. Supp. 2d 432, 439 (E.D.N.Y. 2013) ("While

delay does not always undermine an alleged need for preliminary relief, months-long delays in

seeking preliminary injunctions have repeatedly been held by courts in the Second Circuit to

undercut the sense of urgency accompanying a motion for preliminary relief." (citing cases));

VOX Amplification Ltd. v. Meussdorffer, 50 F. Supp. 3d 355, 376 (E.D.N.Y. 2014) (holding that

while "delay generally destroys the presumption of irreparable harm that follows a showing of likelihood of confusion in a trademark case, the presumption remains in cases where the non-infringing party was unaware of its rights or was actively pursuing its rights." (quotations, alterations and citation omitted)).

Plaintiff allegedly became aware of defendants' alleged copyright infringement on June 2, 2014, (Am. Compl., ¶¶ 16, 24), and commenced this action against them on June 11, 2014, but did not move for a preliminary injunction until April 18, 2015, more than ten (10) months later, and only after defendants moved to dismiss the amended complaint.[9] Even assuming, *arguendo*, that some delay was initially justified while the parties attempted to settle the matter in August 2014, (see Notice of Pending Settlement filed August 6, 2014, Doc. No. 12; and Notice of Settlement Impasse filed August 21, 2014, Doc. No. 15), plaintiffs still failed to seek injunctive relief for approximately eight (8) months after their settlement negotiations broke down, thereby undermining their claim of irreparable harm. See, e.g. Grout Shield Distribs., LLC v. Elio E. Salvo, Inc., 824 F. Supp. 2d 389, 403 (E.D.N.Y. 2011) (finding that the plaintiff's five (5) month delay in moving for a preliminary injunction after settlement negotiations had broken down was unreasonable and undercut its claim of irreparable harm); Marks Org., Inc. v. Joles, 784 F. Supp. 2d 322, 333 (S.D.N.Y. 2011) ("[D]iligent pursuit of settlement negotiations can justify delay (but

_____

[9] Defendants served their motion to dismiss upon plaintiff on or about December 1, 2014, (Doc. No. 42), and plaintiff filed its response thereto on or about December 12, 2014, (Doc. No. 43), yet plaintiff never indicated a need for, nor an intention to seek, a preliminary injunction at that time. Likewise, in the six (6) pretrial conferences held before me in this case between September 24, 2014 and March 18, 2015, plaintiff never indicated a need for, nor an intention to seek, a preliminary injunction in this case.

* * * extensive delay after negotiations break down will still defeat [a finding of irreparable harm]).")

Moreover, the withdrawal of defendants' counsel on August 22, 2014, and defendants' subsequent delay in retaining new counsel on behalf of BMA and in filing an answer to the complaint until October 28, 2014, does not excuse plaintiff's delay in seeking a preliminary injunction. See, e.g. Silber, 950 F. Supp. 2d at 442 (finding the five (5) month delay between the commencement of the action and plaintiffs' motion for a preliminary injunction to be unreasonable because the plaintiffs "were under no obligation to await defendant's answer before moving.") In any event, plaintiff still unreasonably waited approximately six (6) months after defendants retained new counsel and filed an answer before seeking a preliminary injunction. Furthermore, plaintiff's delay cannot be attributed to defendants' filing of the motion to dismiss, see, e.g. Environmental Servs., 7 F. Supp. 3d at 280, because, inter alia, plaintiff responded to the motion on December 12, 2014, only eleven (11) days after the motion had been served upon it, and more than four (4) months before it moved for a preliminary injunction. See, e.g. Vantone Grp. Ltd. Liab. Co. v. Yangpu NGT Indus. Co., Ltd., No. 13-cv-7639, 2015 WL 1055933, at * 4 (S.D.N.Y. Mar. 11, 2015) ("Courts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." (quoting Gidatex, S.r.L. v. Campaniello Imports, Ltd., 13 F.Supp.2d 417, 419 (S.D.N.Y.1998))).

In any event, plaintiff cannot establish irreparable harm with respect to its remaining claims of copyright and trademark infringement, unfair competition and cybersquatting relating

to the parties' websites because, *inter alia*, (1) it is undisputed (a) that defendants' allegedly infringing websites are no longer active and (b) that defendant has been operating a website since at least November 2014 that plaintiff does not claim infringes upon any of its copyrights, trademarks or trade dress; and (2) Burke has represented in a sworn declaration that he will not operate the allegedly infringing websites during the pendency of this litigation.[10] See, e.g. Stokely-Van Camp, Inc. v. Coca-Cola Co., 646 F. Supp. 2d 510, 524-25 (S.D.N.Y. 2009) (finding that the defendant's cessation of the allegedly infringing conduct and commitment not to continue such conduct during the pendency of the lawsuit obviated the need for a preliminary injunction because the plaintiff could not show any likelihood of irreparable injury without the preliminary injunction); Kuklachev v. Gelfman, 629 F. Supp. 2d 236, 249 (E.D.N.Y. 2008), aff'd, 361 F. App'x 161 (2d Cir. Oct. 16, 2009) (holding that the irreparable harm factor requires a showing of a "real or immediate threat that the plaintiff will be wronged again"); American Express Travel Related Servs. Co. v. MasterCard Int'l Inc., 776 F. Supp. 787, 791 (S.D.N.Y. 1991) ("When a defendant revises an allegedly infringing commercial and represents that the original commercial will not be broadcast in the future, the need for injunctive relief as to the original commercial is moot.") Specifically, Burke avers, *inter alia*, (1) that "[j]ust a few weeks after [he] launched [<ilove2kickbox.com>] * * * [p]laintiff sent a 'take down' notice to the host of th[at] [] website, shutting the website down[,]" (Declaration of John Jacob Burke in

---

[10] Burke also contends that "since it started this lawsuit, Plaintiff has also changed the design and layout of its I Love Kickboxing website[,] [which] * * * looks nothing like the website [it] claims is protected in its complaint," (Burke PI Decl., ¶ 15), further undermining plaintiff's claim of irreparable harm.

Opposition to Plaintiff's Motion for Preliminary Injunctive Relief ["Burke PI Decl."], ¶ 10); (2)

that "[t]he <www.ilove2kickbox.com> website remains shut down and is not operative[,]" (id., ¶

11); (3) that "[p]laintiff also sent a 'take down' notice to the host of the

<www.atomickickboxing.com> website, shutting th[at] website down as well[,]" (id., ¶ 12); (4)

that "[a]s a result, and given [p]laintiff's coercive position, *for the pendency of this litigation*, as

a sign of good faith [he] ha[s] taken the step of temporarily using the website on which [he]

normally advertise[s] [his] martial arts training services, <www.burkesmartialarts.com>,to host

the Atomic Kickboxing website and advertise the kickboxing services[,]" (id., ¶ 13) (emphasis

added); and (5) that "the Burke's Martial Arts website has a look and feel that is unquestionably

distinct from that of Plaintiff's I Love Kickboxing website * * * [and] the content on the Burke's

Martial Arts site, which is not in dispute, bears no similarity to the content on Plaintiff's

website." (Id., ¶ 14).[11]   Accordingly, plaintiff's motion for a preliminary injunction is denied in

---

[11]   During the pretrial conferences held before me on November 12, 2014 and February
25, 2015, plaintiff's counsel conceded that defendants' allegedly infringing websites are inactive
and represented that plaintiff has no issue with respect to defendants' present website. In
addition, in their memorandum of law in support of their motion for preliminary injunction,
plaintiff contends, *inter alia*, that "[d]efendants' ILove2Kickbox.com website *included* content
consisting of original constituent elements of [plaintiff's] Work[,]" (Plf. PI Mem. at 6) (emphasis
added); that plaintiff "had the ILove2Kickbox.com website taken down * * *[,]" (id.); that
"[d]efendants' earlier infringing website ILove2Kickbox.com *included* literal copying of * * *
[plaintiff's Website Trade Dress]," (id.) (emphasis added); that "the trade dress Defendants
initially released on the second website, 'atomickickboxing.com' also *mimicked* completely the
trade dress of [plaintiff's] Work[,]" (id. at 7) (emphasis added); that "the Infringing Doman
[ILove2Kickbox.com] was taken down * * *[,]" (id. at 12); and that "[d]efendants' egregious
copying [is] demonstrated by the website *previously* located on the Internet at
www.atomickickboxing.com * * *[,]" (id. at 13) (emphasis in original).

its entirety.[12]

III.   CONCLUSION

For the foregoing reasons, (1) the branch of defendants' motion seeking dismissal of plaintiff's trade dress claim pertaining to its Website pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is granted and so much of plaintiff's trade dress claim as pertains to its Website is dismissed in its entirety with prejudice for failure to state a claim for relief; (2) the branch of defendants' motion seeking dismissal of plaintiff's trade dress claim as pertains to its Store Trade Dress pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is treated as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure and summary judgment is granted dismissing plaintiff's trade dress claim as pertains to its Store Trade Dress in its entirety with prejudice; (3) defendants' motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is otherwise denied; and (4) plaintiff's motion for a preliminary injunction pursuant to 17 U.S.C. § 502, 15 U.S.C. § 116 and Rule 65 of the Federal Rules of Civil Procedure is denied in its entirety.

SO ORDERED.

_____/s/_____
Sandra J. Feuerstein
United States District Judge

Dated: July 8, 2015
        Central Islip, New York

_____

[12] As plaintiff's trade dress claims have been dismissed in their entirety with prejudice, plaintiff clearly cannot establish a likelihood of success on the merits with respect those claims. Thus, it is unnecessary to consider plaintiff's contentions with respect to those claims.